BERT JOHNSTON, Plaintiff in Error,

v.

WORTHAM MACHINERY COMPANY, a Corporation, Defendant in Error.

(No. 2284; Aug. 15, 1944; 151 P. 2d 89)

302

For the plaintiff in error there was a brief and oral argument by R. R. Rose, of Casper, Wyoming.

For the defendant in error there was a brief by Ray E. Lee and Clarence A. Swainson, both of Cheyenne, Wyo., and oral argument by Mr. Lee.

## OPINION

RINER, Justice.

These proceedings in error seek, on behalf of the plaintiff in error, Bert Johnston, plaintiff below, review of a judgment of the District Court of Laramie County. The action was one brought to recover damages from the defendant, Wortham Machinery Company, here the defendant in error, on account of an automobile collision between a motor truck owned by the plaintiff and driven by one of his employees, and a motor vehicle owned by the defendant and operated by one of its servants. Plaintiff alleged the accident was caused by the negligence of the defendant's serv-

ant. This was denied by defendant and by its cross-petition it was asserted that the collision proximately was brought about by the carelessness of plaintiff's employee. Upon the conclusion of the trial, which was to the Court, the latter found that the evidence failed to sustain either plaintiff's claim or that advanced by defendant's cross-petition. It was, accordingly, adjudged that both plaintiff's action and defendant's cross-petition be dismissed, and that each party "pay his and its own costs." No review proceedings were instituted by the Wortham Machinery Company, and the judgment aforesaid has become final as to its cross action. The parties will usually be referred to herein as aligned in the District Court or by their respective names.

The facts which should be considered in disposing of the cause here are, as we view them, and with the judgment of the trial court in mind, substantially as follows:

On or about April 25, 1940, the Summit Construction Company, was engaged in the construction of a federal highway between the town of Glenrock, Wyoming, and a point approximately 15 miles westerly from said town at which point the said highway joined U. S. Highway No. 20, which also passed through that town. The work of hauling and depositing gravel on this new highway was undertaken by the plaintiff and he had a number of trucks engaged in the task among which was one driven by his employee, Marion B. Leach. The gravel thus used was obtained from a gravel pit located about a quarter of a mile south of the road under construction and near "the middle of the job." On the date last mentioned this material was being hauled by means of trucks to a part of the new road which was about two or two and one-half miles easterly from the gravel pit aforesaid. The material

was dumped in windrows located on both the north and south sides of the road. At the place where the accident happened the windrow was on the north side and this point was about a mile or a mile and a quarter from where the last crossing of the old road and the new highway referred to in the next following paragraph occurred.

The auto travel for the general public between Glenrock, westerly towards the city of Casper, was upon the "old road," i. e., Federal Highway No. 20. About half of the old road was on the north side of the new road and the other half was on the south side, the old road being an oiled surfaced highway in good condition. It appears that Federal Highway No. 20, crossed the new road at several places ,the last crossing or intersection where it was necessary to turn off that highway onto the new road in order to reach the gravel pit aforesaid being about two or two and one-half miles distant from the entrance to the road leading to the pit.

On April 25, 1940, one Leonard Hitshew was employed by the defendant to perform service work on certain pieces of machinery located at different places in the state and for that purpose was driving what is called a "pick-up" or "panel" truck. On that date, under instructions from the defendant, he went from Casper, Wyoming, to the town of Glenrock, where he interviewed a Mr. Collins, the Superintendent of the Summit Construction Company, and who was in charge of construction work on the aforesaid highway job. It appears that Hitshew had the duty assigned him of installing a governor spring on one of the motor graders used by the Summit Construction Company, in its work, the machine and the parts to be installed being at the gravel pit already mentioned. Collins told Hitshew, as the latter testified on the

trial that, "if I would hustle up there before they quit he would get a man to help me and also get the parts out of the grease house." It seems that the Summit Construction Company desired this installation work done in the evening when the machine was not in use so that the work upon it would not interfere with its daily regular service.

Hitshew left Glenrock for the gravel pit about 7:30 P. M. As he says, "It was just dark. You couldn't see with your lights and you couldn't see well without them." As a matter of fact, the sun set at 6:50 P. M. on April 25, 1940. He traveled westerly over the old road to the intersection aforesaid where he turned off onto the new road under construction. He had traveled about a mile or a mile and a quarter along this work, the windrow of gravel being to his right though at first it was located on his left as above described, when having met and passed without difficulty one truck loaded with gravel, he observed another approaching. There was a slight curve in the road and Hitshew could see the lights of the on-coming gravel truck as it passed along this curve. He kept his own truck next to the windrow on the right side of the road, with his right wheels thereon, to the extent that he could feel the windrow gravel under them and being well over into the piled-up loose gravel which at this place was about three feet high. The driver of the on-coming truck was Leach and he held his vehicle on the road on his left side close to the gravel windrow, did not turn to the right at all, a head-on collision between the two trucks resulted and each was badly damaged. Leach and Hitshew were each rendered unconscious for some hours as a consequence of the impact.

Leach testified that his employer instructed him to "keep to the hard side of the road" in hauling the gravel; that at the time of the collision he was travel-

ing "approximately twenty miles an hour"; that the lights of his truck were on but were low or dim; that another empty truck met and passed him on his right just before the accident using the borrow pit on that side as a roadway; that this truck raised a cloud of dust and that he did not see the defendant's truck until the vehicles were too close to prevent the accident from happening. However, the record presents the following from Leach's testimony:

"Q. What prevented you from seeing it?

A. The dust and his lights. I never seen his lights.

Q. Did he have any lights on?

A. No, sir."

Hitshew, as a witness for the defendant, stated that at the time of the collision he was driving between thirty-five and forty miles an hour; that he had the lights of his car on but made no signals with them; that he was "figuring" the on-coming truck "would get over," i. e., turn to the right but that it did not.

Other testimony of these two men involved in this accident will be hereinafter mentioned.

The plaintiff contends that the statutory traffic code and the rules of the road have no application to the place where this accident occurred. Our attention is directed to Section 7 of the Chapter 126, Laws of Wyoming, 1939, that chapter being entitled, "Motor Vehicle Traffic Code." That section declares that, "The provisions of this Act relating to the operations of vehicles refer exclusively to the operation of vehicles upon highways" with certain exceptions not material here. We are asked also to consider subparagraph (d) of Section 10 of the same chapter which reads:

"The provisions of this Act shall not apply to persons ,teams, motor vehicles and other equipment while

actually engaged in work upon the surface of a highway but shall apply to such persons and vehicles when traveling to or from such work."

It is not indicated why or how these statutory provisions are applicable to the circumstances of the case at bar. The well known "law of the road" as universally followed in the United States is set forth in that portion of Section 72-204 W.R.S. 1931, which reads:

"Whenever any person, traveling with *any* vehicle or conveyance on *any* road or public highway in this state, shall meet another vehicle or conveyance traveling in an opposite direction it shall be the duty of the driver of such vehicle or conveyance to turn promptly to the right of the center of the traveled road and to remain on the right of the center of the traveled road until such vehicle or conveyance has passed." (Italics supplied.)

The operative effect of the statutory language thus quoted does not seem to have been abrogated or affected by any of the provisions of Chapter 126, supra.

The plaintiff urges that the "place where the accident occurred was neither a road nor a highway." With this contention we cannot agree in so far as it implies that the law of the road mentioned above was not applicable to vehicles meeting and so required to pass each other on this construction work. It will be observed that the statutory language above quoted from Section 72-204, supra, applies to "any road."

In Griffin v. Sanborn, 127 Ga. 17, 56 S.E. 71, the Court held that:

"The word 'road' in its popular sense, is a generic term, including overland ways of every character; but it has no fixed meaning in the law, the scope to be given it depending upon the context in which it appears."

Pertinent here, as we think, is the case of Jaquith v. Richardson, 49 Mass. (8 Metc.) 213. There the

Court had under consideration the law of the road as prescribed in St. 1820, Chapter 65, Section 1, thus:

"* * * that in all cases of persons meeting each other on any bridge, turnpike, or other road, travelling with carriages, wagons, carts, sleds, sleighs, or other vehicle, the persons so meeting shall seasonably turn, drive, and convey their carriages, wagons," &c., "to *the right of the centre* of the travelled part of such bridge, turnpike, or road, so as to enable each other's carriages, wagons," &c., "*to pass each other* without interference or interruption."

It seems that the regular traveled road, as used when no snow was on the ground, was obscured, at the time of the accident in question, by snow, and the defendant insisted that though the track used by vehicles at the place where the accident occurred—a collision between plaintiff's sleigh and defendant's coach —was off the "wrought" road, still he was on the right of the center of the "wrought" part and so within the law. The plaintiff had driven his sleigh completely off the traveled part of the road. Nevertheless the defendant did not turn his conveyance, the coach, to the right at all as plaintiff insisted he should have done inasmuch as there was room to do that. There was a verdict for the plaintiff. Upholding this result the appellate court said:

"We are now called upon to apply the law, which is a most beneficial one, and conducive to the safety and convenience of all the inhabitants of the Commonwealth, to a state of the public road, when, from the season of the year, and the quantity of snow on the ground, the wrought path was obscured from the eye, and the travelled and beaten bath was on the right of the centre of the wrought path. And here we cannot doubt but that the path then beaten and travelled by those passing and repassing on the way, with their sleds and sleighs, was one of those roads contemplated by the framers of the statute, and within its spirit and purview, and that the wrought part is not, for the

time being, the travelled path to which the law of the road is restricted; but that the law is as well applicable to the path, as actually travelled upon the snow, as it is to the wrought part in different seasons of the year."

In connection with the law of the road aforesaid may well be considered our case of O'Malley v. Eagan, 43 Wyo. 233, 248, 2 Pac. 2d 1063, where it will be recalled that the rule as announced in Huddy Ency. of Automobile Law (9th Ed.) Vol. 3-4, 187, Section 116, was set forth thus:

"* * * a driver on the right side of the road has a right to assume that a vehicle aproaching on the wrong side will turn to the proper side in time to avoid a collision, unless it is obvious that the driver of the latter vehicle does not intend to turn, or is unconscious of the danger which is imminent."

Cases were reviewed also in that opinion stating the same principle.

In Peterson v. Jansen, 236 Wis. 292, 295 N.W. 30, the Court says that:

"The duty of both parties driving on a road other than a public highway is to use due care as that term is understood at common law, and this requires that the drivers keep a proper lookout, maintain proper management and control, and when meeting each other drive on the right-hand side of the road. Since this highway was sufficient for the two vehicles to pass, if each carried out the duty of maintaining a proper line of travel, the duty to yield one-half of the roadway is not involved in this case."

Referring to the law of the road in Sills v. Forbes, 33 Cal. App. 2d 219, 91 Pac. 2d 246, we find it said:

"In the United States it has always been customary for drivers to operate their vehicles on the right hand side of a roadway. Numerous statutes have enacted that universal custom into law. The custom itself has established a standard of due care to which all drivers

should be required to conform. This should be true whether they are driving on a public street or highway and are required to drive on its right hand side by law or are on a private road and are required to drive on its right hand side by universal custom."

We pointed out in Jackson v. W. A. Norris, Inc., 54 Wyo. 403, 93 Pac. 2d 498, that the Supreme Court of Pennsylvania, in the case of Brenton v. Colbert, 305 Pa. 277, 157 Atl. 619, held that a "truck driver's negligence which injured a motorist was not excusable because the former was engaged in work on a public highway," and declared that "under such circumstances those engaged in the construction, as well as travelers on the highway, are required to exercise more, rather than less, than ordinary caution."

In the late case of Pestotnik v. Balliet, ........Iowa ........, 10 N.W. 2d 99, we find this language used:

"Appellant argues that the statutes relative to the law of the road did not apply in this case, in that the record fails to show that either the cutoff or No. 169 were open for vehicular travel. There is some evidence that there were signs on the cutoff and over on highway No. 30 to the effect that the cutoff was under construction but we find nothing in the record to indicate that highway No. 169 was officially closed. There is the evidence of the witness Mrs. Rulifson, who lived close to the cutoff, that it was not officially open on the day of the accident. Defendant admits that while coming on to the cutoff from No. 30 he noticed the sign "Road under construction." We do not think that construction work on the highways would nullify or render inoperative the rules of the road."

In the case at bar it is undenied that plaintiff was on his left side of the road next to the windrow of gravel on the north and that he made no effort to turn to the right. Under the law of this state and the authorities above reviewed the trial court could have

and very likely did properly conclude that his position on the road and his failure to turn to the right was a proximate cause of the accident. True, Leach says he did not see Hitshew's vehicle until too close to prevent the collision. The reasons he gives for not seeing the latter's truck approaching are that there was dust in the air, and "his (Hitshew's) lights." So that it is a reasonable inference that Leach must have seen the lights of Hitshew's truck as it drove forward. Hitshew says he observed's Leach's lights, though they were dim, when the plaintiff's truck was about two or three blocks distant. The lights on Hitshew's car, so far as the record shows, were full on and this we must take to be the fact though Leach testifies that the head-lights on defendant's car were not on at all. If Hitshew could see Leach's lights as they came around the slight curve it is difficult to understand why the latter could not have observed the approach of defendant's truck. Hitshew had a right to assume that Leach would turn to the right. The district court evidently concluded, and we think correctly, that under the circumstances Hitshew was driving too rapidly; but this fact does not excuse Leach from obeying the law of the road.

Plaintiff insists that Hitshew was a trespasser and had no right to be on the construction project. We cannot see that this view is correct. No authorities or reasons are submitted in this connection by the plaintiff indicating that, under the circumstances here shown, even if we assume that Hitshew was a trespasser, that that fact should have relieved Leach of the duty of turning to the right. However, the fact is that Hitshew was on the project by the express invitation and direction of Mr. Collins who was superintending this work of construction. Hitshew was on his way to the gravel pit to repair the governor spring

on a motor grader which was in constant use in connection with the construction work. He was obliged to take the road he did in order to get to the gravel pit as promptly as possible and do the repair work as directed. There is no merit in this contention of the plaintiff.

It is also urged for the plaintiff that the work in which Leach was engaged "required him to drive upon the most solid portion of the road wherever it might be and according to his undisputed testimony, the area immediately south of the borrow pit was the only portion of the road upon which he could safely drive because the area to his right was soft dirt into which the wheels of his heavily loaded truck would sink down." In taking this position plaintiff is also mistaken. Whether the ground south of the windrow and to Leach's right at the place of the accident, was firm and hard, is in dispute. Leach as a witness stated:

"Q. Why did you proceed along on the immediate south of the windrow?

A. It was the solid part of the road.

Q. Was there any other part of the road upon which you could proceed safely?

A. No, sir.

Q. What was the condition of the road farther to the south?

A. It was soft and boggy.

Q. Soft and, what did you say?

A. Boggy and spongy."

Hitshew, however, testified, according to the record:

"Q. And what was the condition of the roadbed there?

A. It was good and firm.

Q. Good and firm. For how wide?

A. Oh, for a distance of twenty or twenty-five feet.

Q. Between twenty and twenty-five feet. And was there an ample amount of good roadbed for trucks to pass?

A. Yes, sir.

Q. Where one truck was close to the windrow?

A. Yes, sir.

The trial court was, upon this conflict of testimony, authorized to find that the road at the place of collision was hard and of ample width to allow the meeting and safe passage of the two trucks if Leach had done what he was instructed to do, i. e., to use the hard portion of the road and to turn and keep to the right as the law of the road required, when he saw, or should have seen Hitshew's truck approaching.

All things considered we are not able to see that, upon the facts this record discloses and the law we find applicable thereto, the trial court was in error in concluding that both were proximately responsible for the regrettable accident and, accordingly the judgment of the District Court of Laramie County should be affirmed.

*Affirmed.*

KIMBALL, C. J., AND BLUME, J., concur.