No. 19,749.

L. R. HALE, COUNTY CLERK & RECORDER OF MONTROSE COUNTY *v.* FRED SULLIVAN, ET AL.
(362 P. [2d] 402)

Decided May 22, 1961.

Messrs. BRYANT, PETRIE, WALDECK & KING, for plaintiff in error.

Mr. J. A. HUGHES, for defendants in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

PLAINTIFF in error, who was defendant in the trial court, seeks review of a judgment upholding a proposal authorizing the county commissioners of Montrose County to issue bonds in the amount of $100,000 for airport purposes at Nucla and Montrose, Colorado. A declaratory judgment suit was filed by the board of county commissioners against the plaintiff in error as County Clerk of Montrose County alleging that the above described proposal had been submitted in an election held November 8, 1960, and was passed by a vote of 2,235 in favor to 1,158 votes against; that thereafter plaintiffs adopted a resolution directing the defendant to publish and sign a notice of sale of the authorized bonds. Defendant refused to sign the notice, and in his answer, although admitting all of the facts alleged in the complaint, asserted existence of a question as to the validity of the authorizing statute, C.R.S. '53, 36-6-1.

Defendant contends that Article XI, Section 6 of the Constitution of Colorado prohibits contracting by a county of a debt except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges. The answer further alleges that some of the funds were to be used for the acquisition and building

of landing strips, airports and approaches thereto, and that it thus violates the cited constitutional provision.

Following trial to the court an opinion was rendered upholding the statute and concluding that the term "road" is not restricted to automobile or other similar ways, but includes airport facilities as well. The undisputed facts found by the trial court furnish a concise summary of the important elements in the case:

"1. That the county owned the Montrose and Nucla airports;

"2. That such facilities were a necessary and integral part of the modern transportation system in the county;

"3. That such airports were not only dedicated to the public use, but they were used by the public indiscriminately;

"4. That there was an urgent and necessary need for the repairs and improvements to such airport facilities estimated to cost $209,076 (50% to be paid by the federal government), and

"5. That at the last general election the taxpaying electorate voted 2,235 in favor and 1,158 against the issuance of the bonds."

In support of his contention that the judgment should be reversed, plaintiff in error argues:

*First,* that the county, being a political subdivision of the state, has no inherent power to contract indebtedness and that bonds can be issued only in accordance with valid legislative authorization.

*Secondly,* that the constitutional provision restricting county authority to indebtedness contracted for roads, bridges and buildings is not susceptible to a construction authorizing the building of airports or airport facilities.

The commissioners contend that the framers of the constitution did not intend the terms used in the provision now before us to be limited to the transportation facilities then in existence; that even though they were unaware of the airplane and its necessary service facilities, they nevertheless intended to grant to counties the

authority to build any type of way necessary to facilitate public transportation. They say the term "road" is a broad generic term, not restricted to the animal drawn vehicle or even to the automobile.

The statutory provision in question, C.R.S. '53, 36-6-1, reads:

"When the county commissioners of any county shall deem it necessary to create an indebtedness for the purpose of erecting necessary public buildings, making or repairing public roads or bridges, acquiring or building or acquiring and building airports and landing strips, including the necessary land therefor, and approaches thereto, by an order entered of record specifying the amount required and the object for which such debt is created, they may submit the question to a vote of the people at a general election; * * * "

The exact terms of the constitutional provision, Article XI, Section 6, which is said to invalidate the above enactment as applied to the proposal now before us, are as follows:

"No county shall contract any debt by loan in any form except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges; * * * "

There is a dearth of authority in Colorado on the exact question which is whether a constitutional provision such as the quoted one prohibits the incurring of indebtedness for airport purposes. This Court has recognized that the acquiring of land for an airport is public in its nature and that a city has authority to build an airport outside its municipal boundaries. See *Denver v. Board of Commissioners of Arapahoe County*, 113 Colo. 150, 156 P. (2d) 101. This recognition of the airport as a necessary public institution has been generally accepted.

In 1944 in his work on *Airports and the Courts* (p. 18), Rhyne wrote:

"With the end of the war there will be expansion and development in the aviation field far beyond anything

now within the imagination of many who are considered farsighted today. The 'air age' has arrived. A community which expects to keep up with the progress of mankind must be served by an adequate airport to meet the community's needs from this rapidly developing new means of transportation. The need for more airports and for larger and better airports is an accepted fact. Regardless of technical developments, the airport will continue as the keystone of aviation as all airplanes must take off and land on either land or water. Airports must therefore increase in size and number to meet the needs of the 'air age.' "

The Missouri Supreme Court in the case of *Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W. (2d) 1045, in commenting on the public nature of the airport, declared:

"An airport with its beacons, landing fields, runways, and hangars is analogous to a harbor with its lights, wharves and docks; the one is the landing place and haven of ships that navigate the water, the other of those that navigate the air. With respect to the public use which each subserves they are essentially of the same character. If the ownership and maintenance of one falls within the scope of municipal government, it would seem that the other must necessarily do so. We accordingly hold that the acquisition and control of an airport is a city purpose within the purview of general constitutional law."

And see the comment of Mr. Justice Cardozo in *Hesse v. Rath*, 249 N.Y. 436, 164 N.E. 342, as follows:

"We think the purpose to be served is both public and municipal. A city acts for city purposes when it builds a dock or a bridge or a street or a subway. Its purpose is not different when it builds an airport. Aviation is today an established method of transportation. The future, even the near future will make it still more general. * * * "

The defendant's argument is addressed less to the term "necessary public buildings" than to the term "pub-

lic roads." It is said that airport runways and approaches are not roads as that term is commonly used and that therefore no express authorization for the proposed indebtedness exists and thus it must be voided.

There are few cases treating the county problem and construing constitutional provisions such as Article XI, Section 6, supra. Defendant relies on a decision of the Supreme Court of South Carolina in *Gentry v. Taylor,* 192 S.C. 145, 5 S.E. (2d) 857, where a bond issue for the enlargement of an existing airport was invalidated on the ground that it was not "for ordinary county purposes" within the meaning of a provision of the Constitution of South Carolina not unlike our own. The South Carolina Court reasoned that the proposal was not within the term "ordinary" and went on to say:

" * * * We may here add that if the provisions of the constitution are not broad enough or sufficiently elastic to meet the needs or requirements of present day life, that instrument itself provides how this may be done, if the people so will."

Subsequently in the case of *Parrott v. Gourdin,* 205 S.C. 364, 32 S.E. (2d) 14, decided in 1944, the *Gentry* case was reaffirmed and the Court rejected the argument that the airport constituted an integral part of a public transportation system.

A contrary view was announced in *Swoger v. Glynn County,* 179 Ga. 768, 177 S.E. 723, where the Georgia Court construed a statute authorizing counties to construct airports as against the argument that it violated a constitutional provision limiting county taxes to building and repairing public buildings, bridges and roads. In upholding this statute, the Supreme Court of Georgia held that it is for the legislature, not the courts, to determine the character of the roads and that the legislature was within its power in authorizing the county to build runways, etc.

In the case at bar, the trial court gave a broad meaning to the term in question, saying:

"The word 'road' in its popular sense is a generic term and includes overland ways of every character; the scope to be given it, depending on the context in which it appears, Griffin v. Sandborn, 56 S.E. 71, 127 Ga. 17; Johnston v. Wortham Machinery Co., 151 P. 2d 89, 91, 60 Wyo. 301. The word is ordinarily applied to a *free* public way in the county, Parsons v. Wright, 27 S.E. 2d 534, 536, 223 N.C. 520. The word also includes ferries, canals and navigable rivers, Strange v. Board of County Commissioners of Grant County, 91 N.E. 242, 247, 173 Ind. 640, and Almond v. Gilmer, 51 S.E. 2d 272, 277, 278, 188 Ga. 822. Websters New Practical Dictionary, 1957 Edition, defines 'road' as '1. A highway. 2. A path; way; 3. A place, less enclosed than a harbor, where ships may ride at anchor; . . . 4. Railroad; railway.' "

To restrict the term "roads" to the definition of that term under the conditions of the time, and which had acceptance in the year 1876, when the Constitution was adopted, would be most unreasonable. The word has a much broader meaning and may be said to include "overland ways of every character" even though not then envisioned by the framers of the Constitution. The airports of this nation are links in the transportation system, hence runways and landing strips, being a necessary unit of that system, need no longer be regarded as unique or peculiar. They are as logically within the term "roads" as are automobile highways, about which no one would now raise a question, and neither of which were envisioned by those sturdy men of 1876 who framed the Constitution.

In adopting a view contrary to that pronounced by the Supreme Court of South Carolina, it must be noted that a different conception of the airport runway now exists than was accepted as of the date of those decisions. It is quite possible that, in the light of changed conditions, the South Carolina Court would now view the matter differently.

We are persuaded from a reading of the testimony in

this record, and from a consideration of the arguments of counsel and the opinion of the learned trial court that the statute, 36-6-1, supra, does not violate the constitution and that the trial court was correct in so holding.

The judgment is affirmed.