No. 15,497.

CITY AND COUNTY OF DENVER *v.* BOARD OF COMMISSIONERS OF ARAPAHOE COUNTY.
(156 P. [2d] 101)

Decided January 8, 1945. Rehearing denied February 19, 1945.

152

Mr. MALCOLM LINDSEY, Mr. GLENN G. SAUNDERS, Mr. THOMAS E. BOYLES, for plaintff in error.

Mr. C. L. HARRISON, Mr. KENNETH W. ROBINSON, Mr. ALBERT T. FRANTZ, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE YOUNG delivered the opinion of the court.

The City and County of Denver prosecutes a writ of error to reverse a judgment of the district court of Arapahoe county in an action wherein the board of county commissioners of said county sought to have the district court find and determine certain facts, make certain declarations of law, and upon such findings and declarations enjoin the city from further proceedings to acquire land and to establish an airport in Arapahoe county. The court made findings and declarations in favor of the board and against the city, and issued a permanent injunction to restrain the city from proceeding further to carry out the project. The parties are designated, for convenience, as "Denver," or the "city," and the "county," since the board of county commissioners sues as the representative of the county.

Denver regularly passed an ordinance which, so far as pertinent, provides:

"Section 1. In order to meet the rapidly increasing need for airport facilities, the Mayor is hereby authorized to acquire, on behalf of the City and County of Denver, not to exceed two thousand acres of land for an additional airport for the City and County of Denver.

"Section 2. The said land so to be acquired for an additional airport shall be located in Sections 22, 23, 26, 27, and 35, in Township 5 South, of Range 68 West of the 6th Principal Meridian, and shall consist of such lands as the Mayor shall determine to be most suitable for an airport."

Section 3 provides in the event the lands can not otherwise be procured, for their condemnation. Consideration of the remaining sections is not pertinent to any issues here involved. This will be referred to for brevity, as the "ordinance."

Pursuant to the ordinance the Mayor selected for the projected airport a site south of Denver and southeast of the town of Littleton; determined that a tract of 1552 acres was necessary and proper to effect the city's object and designated the land to be procured. One hundred sixty-eight acres were purchased and the city instituted condemnation suits to procure the remainder. The larger portion of this land is more than five miles from the boundary of Denver. It was at this point in the procedure that the county brought suit to enjoin the city from proceeding further, resulting in the judgment above mentioned.

The city in its brief argues its case under five headings, or issues, all of which are properly raised by the specification of points for reversal. The county in rebuttal of the city's contentions argues six points in its brief which we think responsive and properly require consideration. For the sake of brevity we shall follow the paths so outlined by the parties inasmuch as a determination of the issues so raised will indicate the proper resolution of the controversy.

The city's first point is: "Denver's power to acquire lands for an airport is not limited to lands within five miles of its boundaries." The right of Denver to acquire lands within five miles of its boundary is not controverted. Section 42, c. 163, vol. 4, '35 C.S.A. provides: "The city council and board of trustees in towns shall have the power to acquire, establish, construct, own, control, lease, equip, improve, maintain, operate and regulate airports and landing fields for the use of aeroplanes and other aircraft either within such municipalities or within five miles of the boundaries of such cities and towns, or may set apart and use for

such purpose real property owned by the city or town. * * *"

Section 43 of said chapter 163, provides for the condemnation of lands for such airports, if not otherwise obtainable. Section 44 of said chapter 163 provides: "The city council or boards of trustees in towns shall have the power to incur indebtedness for any of the purposes mentioned in this subdivision and to issue bonds for the acquisition, construction and improvements of airports and landing fields and appurtenances thereto, in the same form and manner as debt is incurred and bonds issued for other municipal purposes."

The city stresses the point that the section last mentioned provides for the incurring of indebtedness for such airports, as "for other municipal purposes" and that this is clear evidence that the General Assembly, while it did not declare specifically that the acquisition and construction of an airport is a municipal purpose, by necessary implication did declare it to be such. We think the point well taken. The fact that the General Assembly has authorized cities and towns generally to construct, operate and maintain airports within five miles of their boundaries makes their construction, operation and maintenance within such limits a municipal purpose. The only point necessary to determine here is whether Denver, a charter city under Article XX of the state Constitution, has authority in carrying out the municipal purpose of acquiring, constructing, operating and maintaining an airport, to do so beyond five miles from the boundary of the city. There is nothing in the act conferring authority upon cities so to do within a five-mile limit of their boundaries to indicate that in prescribing such limit the state was exercising any police power possessed by it. The act does nothing more than confer additional power on municipalities to permit them to deal in a manner calculated to promote their convenience and economic interests with a new and growing method of transporta-

tion. There can be no doubt that the legislature might have fixed a ten- instead of a five-mile limit, in which case the city's proposed airport would be within the area limited by the statute and without question lawfully might be constructed and operated. The Court of Appeals, in *Warner v. Town of Gunnison*, 2 Colo. App. 430, 31 Pac. 238, said: "The power of the legislature to narrow or broaden municipal jurisdiction, save as controlled by constitutional restrictions, is practically unlimited." Under a line of decisions of this court, we have held that if the General Assembly can confer a power upon any city which derives its authority from statutes passed by the state that a charter city, such as Denver, already possesses the power without legislative action. In the case of *Fishel v. City and County of Denver*, 106 Colo. 576, 108 P. (2d) 236, we said: "We have uniformly held that this amendment, among other things, conferred upon Denver, as well as other home-rule municipalities organized under section 6 thereof, every power possessed by the general assembly in granting charters generally [Citing cases]. As before stated the legislature, prior to the adoption of the Home-rule Amendment, constitutionally could have conferred upon a municipality the power here questioned and in accordance with the view taken in the cases last cited it must be considered that such authority now is vested in the city by virtue of the amendment. This legal situation makes impotent Fishel's corollary objection that the city is without power to condemn property outside its corporate limits. In this connection Fishel does not question that the people and the general assembly *could* confer upon a municipality the right to condemn private property outside of its boundaries for its local public use, but contends that such has *not* been done as to the project here involved. It being thus conceded that the legislature possessed the right here questioned, it would seem clear that under the doctrine of the cases last above enumerated such

power passed to the city by the Twentieth Amendment."

■ Under the principle announced in the foregoing case and in others which it follows, we hold that Denver, as a charter city under Article XX of the Constitution, is not restricted by the act of the Legislature, sections 42 to 46, chapter 163, supra, to the acquisition, construction and operation of an airport to the territory within five miles of her boundaries.

■ The second proposition which the city asserts is that, "Denver has the power to acquire, for an airport, lands traversed by public roads when there are other public roads which can be made available."

This proposition involves a factual and a legal question. First, are there other roads available? This under the record we think must be answered in the affirmative. The proposed tract is, roughly speaking, north and south, two and one-half miles long, and east and west, a mile wide. It lies between the roads that are the prolongations southerly of two of Denver's principal streets of ingress and egress from the south, University Avenue and South Broadway. Its westerly side abuts on the prolongation of South Broadway. Of the five quarter sections lying between the projected field and the prolongation of University Avenue, which are not designated as part of the field, four abut on said University Avenue road, and two on the county line road south of the field, giving access either to the University Avenue road or to the South Broadway road.

The second and legal question, whether Denver has the power to acquire lands for an airport which are traversed by county roads as an abstract legal proposition must be answered in the affirmative. At least, that she *may* have such authority is not open to question. Even the case upon which the county relies, *Denver Power & Irrigation Company v. Denver & Rio Grande Railroad Company,* 30 Colo. 204, 69 Pac. 568, assumes that the right to take property already dedicated

to a public use for another public use exists in some cases. In that opinion it is said: "Where, however, land is already devoted to a public use, it would be wholly unreasonable to permit it to be taken for another public use which would nullify and defeat the one to which it is already devoted, except in cases where the overwhelming necessities of the public were such that in order to serve their needs, or supply their necessities, the taking of such property became necessary."

It appears from the record that condemnation suits to which the county is a party are pending to determine the city's right to take the lands in question. In those suits one of the issues that properly and necessarily will be litigated is whether the city has a right to condemn and take the land devoted to road purposes and use the same for an airport. Although in the case last cited and relied upon by the county as denying the right to condemn the roads the general proposition is announced that property devoted to one public use can not be taken for another public use, there are exceptional circumstances noted therein under which it is conceded that property devoted to a public use, under the stress of public necessity, may be condemned for another public use. The trial court erred in finding that under no circumstances may property devoted to public road purposes be taken for another public purpose. Such finding furnished no legal basis for enjoining the prosecution of specific condemnation suits in which the issue well might arise under the evidence adduced on any or all of the trials whether the case should fall within the general rule or constitute an exception to it.

In so holding that the trial court was in error, it should not be assumed that we are determining either that the city may or may not by condemnation proceedings acquire the roads for airport purposes. Our holding should be construed as going no further than determining that upon the showing before the court in this case which may or may not be the showing when the

right to acquire the roads by condemnation is litigated in the pending suits, the court was not authorized to enjoin condemnation proceedings which might disclose a public necessity sufficiently great or other adequate factual or legal ground constituting an exception to the general rule laid down in *Denver Power & Irrigation Co. v. Denver & Rio Grande Railroad Co., supra.* The trial court should have left that question open for determination in the pending litigation, and not have attempted to settle it in advance by a declaratory judgment.

■ The third point upon which Denver relies is: "Denver does not need to first obtain the consent of Arapahoe county to the acquisition, for an airport, of lands already zoned for airport purposes by the Arapahoe county officials; and the establishment of the proposed airport does not violate the zoning law."

This proposition also we think is sound. In their briefs, neither the city nor the county sets forth in full the text of section 9, chapter 45-A, 1943 Cumulative Supplement to 1935 C.S.A. It is as follows: "Whenever any county or regional planning commission shall have adopted a master plan of the county or region or any part thereof, then and thenceforth no road, park, or other public way, ground, or space, no public building or structure, or no public utility, whether publicly or privately owned, shall be constructed or authorized in the unincorporated territory of the county or region until and unless the proposed location and extent thereof shall have been submitted to and approved by such county or regional planning commission; provided, however, that in case of disapproval, the commission shall communicate its reasons to the board of county commissioners of the county in which the public way, ground, space, building, structure, or utility is proposed to be located; and such board shall have the power to overrule such disapproval by a vote of not less than a majority of its entire membership, and upon such over-

ruling said board or other official in charge of proposed construction or authorization may proceed therewith; *provided, further, however, that if the public way, ground, space, building, structure, or utility be one the authorization or financing of which does not, under the law governing the same, fall within the province of the board of county commissioners or other county official or board, then the submission to the commission shall be by the body or official having such jurisdiction, and the commission's disapproval may be overruled by said body by a vote of not less than a majority of its entire membership or by said official.* The acceptance, widening, removal, extension, relocation, narrowing, vacation, abandonment, change of use, acquisition of land for, or sale or lease of any road, park, or other public way, ground, place, property, or structure shall be subject to similar submission and approval, and the failure to approve may be similarly overruled. The failure of the commission to act within thirty days from and after the date of official submission to it shall be deemed approval, unless a longer period be granted by the submitting board, body, or official." (Italics ours)

The city contends that it may make the statutorily-required application to the planning commission after the lands are acquired, before construction of the airport is finally begun. The county contends that the application is a condition precedent even to the acquisition of the lands. The county contends further that the zoning law is an exercise of the state's police power and hence binding upon charter cities operating under the Twentieth Amendment; that the county, under the statute, is the state's exclusive agency to enforce its police power and that the city may not thwart the exercise of the power conferred upon the county by the state. It is axiomatic that the law does not require the doing of a vain thing and we think it follows as a corollary to this proposition that an injunction should not lie to prevent the city from going forward with its condemnation suits

because it failed as a condition precedent thereto to do a thing that would have availed the county nothing. The second proviso in the foregoing section negatives the county's contention that the county is vested with exclusive power as agent of the state to enforce the zoning regulations. After a master plan of zoning the county is adopted, as the record shows has been done by Arapahoe county, if the board of county commissioners or any county board or official of the county charged with the duty of erecting any structure or work of a public nature, such as are enumerated in the statute, shall make the statutorily-required submission of plan to the planning commission and the commission disapproves of the project, it is required to submit its reasons for disapproval to the board of county commissioners and by majority vote the board may nullify the commission's disapproval and proceed with the project. Similarly, the second proviso sets forth that if the financing and construction of the project does not fall within the province of the board of county commissioners, or other county board or official, but within the province of some other public body or official, and in the instant case it falls within the province of the City of Denver to finance and construct the airport, then such other body or official, in this case the City of Denver, shall report the plan to the planning commission and if it disapproves and returns its disapproval with the reasons therefor to the body [city] the body [city] by a majority vote may overrule and nullify the planning commission's disapproval and proceed with the project. When the land in question had been so zoned, as the record shows had been done under the master plan, that an airport constitutes a proper use in the development of the land, the county, under the statute, the sole source of its power, does not possess the exclusive authority to permit or deny the construction of an airport for when such a project is sought to be accomplished by a public body such as a city, or public official

authorized to carry out such project, the public body or official so charged, and not the board of county commissioners, has the ultimate voice on whether the project shall be carried out. It was error for the court at the instance of the board of county commissioners to enjoin the carrying out of the city's plan to construct an airport because the planning commission had not first been asked to approve it or even though it theretofore might have disapproved it. The city in this case, and not the board of county commissioners, has the right to override a disapproval by the planning commission. The board of county commissioners cannot do indirectly by injunctive order of court a thing that it has no authority to do or have done directly under any circumstances. When application is made to the planning commission at any time, if it disapproves the plan proposed, the body by which the city expresses its will, the city council, may by majority vote nullify the planning commission's disapproval and nothng more is required under the statute to permit it to proceed with construction of the airport. It is futile and useless to enjoin the city from carrying out a project in which it is asserting a right and actively attempting to carry out, because it has not or in the future might not, though possessing the power, overrule the planning commission's disapproval if such disapproval of the plan should be voiced.

■ The fourth proposition which the city submits is that: "The trial court did not have power to hold that Denver required only 320 acres for its proposed airport."

We are of the opinion that this proposition also must be sustained. We have held that it is the province and right of the municipality to determine what property may be required to carry out a municipal purpose and therefore what property must necessarily be condemned, if not otherwise procurable, to effectuate it. This right is not an unlimited right and subject to no control. The courts may, if it clearly appears that the action was fraudulent or unreasonable, interpose their authority to

grant relief to those who would be the sufferers from such action. In *Lavelle v. Town of Julesburg*, 49 Colo. 290, 112 Pac. 774, we said: "It is the province of the town authorities to determine what property shall be taken and condemned upon which to construct a plant to operate a waterworks system belonging to the town. As applied to the facts of this case, the exercise of discretionary power and judgment of municipal officers, when acting within the scope of their authority, is conclusive unless it clearly appears their action was fraudulent or unreasonable."

To the same effect are two cases cited in the opinion in the foregoing case: *Kirkwood v. School District*, 45 Colo. 368, 101 Pac. 343, and *Warner v. Town of Gunnison*, 2 Colo. App. 430, 31 Pac. 238. We have carefully considered the evidence in the instant case. No suggestion of fraud appears. Neither do we think that upon a fair appraisal of the situation of Denver with respect to the present needs for airport facilities to handle the business incident to the use of small and private planes and the reasonably to be expected increase in that business in the reasonably immediate future that the amount of ground proposed to be used is so great that a court can say that the city's proposed acquisition and development of it is unreasonable. While the present need is to supply facilities for small private planes, it would be a shortsighted policy, in the light of past experience, to procure a field barely sufficient to accommodate planes of the present type. An air field is not a temporary work built for a day; it involves a vast outlay of money. If in the reasonably immediate future it becomes inadequate due to the increase of air traffic or to the improvement and enlargement of planes and to their increased takeoff and landing speeds it will become a hazard to those who use it. Furthermore, Denver is the largest city between the Missouri river and the Pacific coast. It is a center of manufacturing and distribution for a wide area. Passenger traffic by air is heavy and

within the near future no doubt will become heavier. All of these facts do not appear in the record, but such as do not are facts that the generality of men know and that courts should know. These factors considered, the amount of land required for a reasonably adequate field is not susceptible of accurate determination. Courts are in no better position to determine it than are the officials of the municipality. Under the circumstances that exist and the difficulties of accurately and certainly predicting the requirements of the reasonably immediate future, a correspondingly wide latitude for differences of judgment must be allowed by courts before they brand a judgment as clearly unreasonable—that is, as being so far out of line with the judgments of reasonably intelligent and reasonably well informed men that a court can say no reasonable man would form or entertain it. We think under the evidence in the record that there is a sufficient basis for a reasonably intelligent and reasonably well informed man to arrive at a judgment that the amount of land the city proposes to acquire is necessary to provide for the present and reasonably to be anticipated needs of the reasonably immediate future. The district court erred in holding and determining that 320 acres was sufficient to establish an airport adequate for the city's needs, thus substituting its judgment for that of the officials of the municipalities charged with the duty of determining the quantity of land required for the purpose when their judgment, formally expressed by the ordinance, was neither tainted with fraud nor, under the controlling principles we have laid down, tainted with unreasonableness.

The fifth proposition set forth by the city is that "Article XX of the Colorado Constitution gives Denver ample power to establish the proposed airport."

We are of the opinion that it does give Denver such power, but in so holding we should not be understood as determining that the power to establish the proposed airport is not subject to the hazard of any legal or suffi-

cient defense that may be interposed in a condemnation suit as regards any particular land or right that may be therein involved. Subject to this qualification, we rest our holding on the law as announced by us in the case of *Fishel v. City and County of Denver, supra.* The quotation which appears in a former section of this opinion sets forth our holding in that case as to the power of Denver to acquire and use lands for municipal purposes outside of its boundaries. That case is authority for our holding in this case that Denver has the power to establish the proposed airport.

The first point the county urges in rebuttal of the city's contentions is that, "The attempted condemnation by Denver of 1552 acres is for a prohibited sectarian and private use." .

It appears that Denver University, a private and sectarian institution, was interested in the establishment of an airport because it conducts a school for glider pilots and hoped to use the field if established in the course of pilot instruction. It appears further that it was interested in the city's procuring a field adequate for that purpose. We think it a fair conclusion from the record that the city officials gave some consideration to procuring a field adequate for glider use. The record discloses that in various European countries there are vast numbers of glider pilots and that while the number in this country is relatively small, the influence of the war has stimulated a demand for such training. In the answer, Denver admits that it proposes to permit the field to be used in any manner that will facilitate the military operations of the United States during the continuance of the war, but that as soon as permitted will use it solely for public purposes in the same manner as the streets of the City and County of Denver are used for automobile transportation. The use of the field which Denver University hoped to make, though it does not appear that the city had contracted or given any assurance that it might so use it, was not of a perma-

nent, but merely of a temporary, character. The trial court so found. Furthermore, we think it a fair inference from the record that such projected use by Denver University is a use brought about by, and incidental to, the state of war that exists at the present time.

The ordinance makes no mention of the use of the field by Denver University, or by any other person for glider purposes. It nowhere appears that if Denver University should tomorrow discontinue its glider course or close its doors, that Denver would not be confronted with a situation making the acquisition of a supplemental airport desirable and necessary. We think there is no more merit in the contention that the acquisition of the airport is for private and sectarian purposes, than there would be in the same contention if it should appear that the owners of the several hundreds of private planes in Colorado who desire to use the field were all Baptists, Methodists, Episcopalians or Roman Catholics. In the case of any municipally-provided utility or facility, those who use it are principally private persons, corporations and institutions, as for instance, the users of a municipally-owned and operated lighting system, gas plant, waterworks or tramway system. If either a person or an institution properly might use a municipally-provided utility, neither, as a component part of the public, should be discriminated against on the ground of religious convictions or affiliations. Municipally owned and controlled utilities regularly serve churches and sectarian institutions. It does not appear to us as a sound legal proposition that if a large religious institution, as frequently happens, is located in a small town and would use one-half or more of the electric current or water to be supplied by a municipal plant, that it would be a defense to a suit to condemn land for such a plant that the objective was for a private or sectarian purpose. Neither do we think the proceeding to establish such a plant and condemn land for it would be so tainted with sectarianism as to bar its ac-

complishment because the municipal officials considered the needs and desires of the institution as a part of the public in determining the desirability and necessity of such a project. Whether after the airport is constructed its use by Denver University in the manner contemplated is or will be proper, we do not determine. Denver University is not a party to this proceeding. Its rights can be determined in a proper suit to which it is a party if any controversy concerning them shall arise.

The county's second point is that "Denver could not invade Arapahoe county against its will and imperil Arapahoe county's ability to function."

The answer to this is fully covered under our holdings heretofore set forth that Denver under the Constitution and laws of Colorado has power to establish an airport in Arapahoe county more than five miles from the boundary of the city; and that under the Constitution and laws of the state neither the county, nor any of its agencies is given a veto power over such action. Doing what one lawfully may do does not constitute in a legal sense an invasion of another's rights or an impairment of his or its ability to function.

The third point the county urges is that, "The proposal to construct the airfield violates the resolution of the Arapahoe County Planning Commission zoning Arapahoe County passed pursuant to law." What we have said heretofore when considering the city's third point, disposes of this contention adversely to the county.

The fourth point submitted by the county is that, "The destruction of public highways under the facts herein is not a proper exercise of eminent domain." For the reasons set forth under our disposition of the city's second point we express no opinion in this case on this proposition.

The county's fifth point that, "The statute giving cities power to acquire and establish airports and landing fields within five miles of its boundaries is a declaration of public policy of the state, limiting airfields to within

such five miles," is determined adversely to the county by our holding in and for the reasons set forth under our consideration of the third point urged by the city. ▮ ▮ The sixth point urged by the county is that, "The attempted condemnation of more than 1552 acres is excessive, arbitrary, unreasonable and capricious."

We have heretofore held in our opinion that Denver has a right to establish an airport in Arapahoe county and to proceed in condemnation if necessary to procure it. The point here urged involves two propositions: (1) Is the projected airport so unreasonably large, that the action of the city in attempting to acquire the quantity of land required for its establishment, is arbitrary or capricious? and (2) Is the question embraced in the first proposition one which the county in a suit by its county commissioners may raise? The only possible concern of the county as a governmental unit can have in the matter is that a transfer of the property of private citizens to the city for its municipal purposes will result in removing it from the tax rolls of the county and thus deprive the county of a portion of its revenues. The property sought to be condemned is the property of private owners and not the property of the county. Private property, that is the property of a citizen, may not be taken for public purposes without compensation being paid therefor. If not required for a public purpose, the owner may resist its being taken from him and upon such showing keep his property. The constitutional prohibition is for the owner's protection. Nowhere does the Constitution say that private property may not be transferred to be used for a public purpose over the objection of the board of county commissioners when the transfer will result in the property being lost to the county for tax purposes. Suppose the owners of the property in condemnation suits saw fit, as did one owner of 168 acres, to sell the property to Denver without forcing her to resort to condemnation. Could the board of county commissioners enjoin such sale because

the property would thereby be removed from the tax rolls? The statute by which the state authorizes cities within five miles of their boundaries to establish airports does not say that this means little ones and not big ones, nor does it say they shall be of such size as shall be deemed suitable by the board of county commissioners. We have quoted the language used in the opinion in *Warner v. Town of Gunnison, supra,* to the effect that the power of the legislature to extend municipal jurisdiction, save as restricted by the Constitution, is practically unlimited. Any extension of municipal jurisdiction necessarily conflicts with and destroys pro tanto any preexisting jurisdiction. Counties have only such powers as are directly conferred by the Constitution or granted by the legislature. If a new county may be created out of the territory of one or more presently existing counties, as we held might be done in *Frost v. Pfeiffer,* 26 Colo. 338, 58 Pac. 147, thus depriving the existing county or counties of tax revenues from the territory embraced within the new county, it surely can not be that there is any constitutional obligation on the legislature not to do or authorize the doing of any act that will result in reducing the amount of lands on the county tax rolls. There being no such duty on the part of the legislature, and since we have held that the county is not, as contended by it, the exclusive agency of the state to enforce the police power asserted by the state in the zoning laws, it follows that the county has no standing to raise as against the city the question of the excessive amount of the land sought to be condemned, this being a defense available to the property holders in the pending actions.

The injunction issued by the district court is dissolved and the judgment is reversed.

MR. JUSTICE JACKSON dissents.

MR. JUSTICE ALTER did not participate.