**RICHMOND HEIGHTS (Village), Appellant, v. BOARD OF COUNTY COMMISSIONERS OF CUYAHOGA COUNTY, OHIO, et, Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25026. Decided March 29, 1960.

Baskin, Kelley, Lausche and Heavilin, for appellant.
John T. Corrigan, Pros. Atty., A. M. Braun, for appellees.

(FESS, PJ, of the Sixth District, YOUNGER and GUERNSEY, JJ, of the Third District, sitting by designation in the Eighth District.)

**OPINION**

By FESS, J.

Appeal on questions of law and fact taken by the plaintiff from a judgment of the Court of Common Pleas granting a portion of the injunctive relief sought by plaintiff against the defendants-appellees.

Upon this appeal on law and fact we find the following salient facts extracted from the opinion of the trial court dated April 15, 1959, as follows:

The plaintiff Village of Richmond Heights (herein called the Village) brings its action to enjoin the defendant Board of County Commissioners (herein called the Commissioners) from proceeding further in an action filed January 30, 1957, in this court, to appropriate, for county airport purposes, the 23-acre parcel of vacant land which the Village purchased June 25, 1956, from the Speyers. Other parcels totalling 103 acres have already been acquired under the same appropriation proceedings.

In its petition the Village says that it acquired and is proceeding to use the property—

"As a cite for the construction of a necessary and presently much needed Village Hall to provide headquarters for the transaction of official business of the municipality, for the plaintiff's council meetings and other public assemblies, and for the offices of its municipal departments and officials . . . Also plaintiff says that it plans to build on said described property, headquarters and offices for its police and fire departments, and housing the facilities and equipment of said departments, and to establish thereon park grounds and recreation facilities for the municipal residents and the public generally."

In the petition it is recited in substance that after the acquisition of said described property by the plaintiff municipality the Commissioners, on June 28, 1956, adopted a resolution which declared their intention to appropriate the plaintiff's property for the improvement and expansion of the Cuyahoga County Airport fronting on Richmond Road extending east to Bishop Road and lying partly in Richmond Heights and partly in Highland Heights; and on December 27, 1956, the Commissioners passed a second resolution directing the County Prosecutor to proceed with the acquisition of the described property, stating that said property was required for public use in connection with the improvement of the aforesaid Cuyahoga County Airport; and that the County Prosecutor has filed the action to appropriate, being cause No. 692,840 in this court.

The Village alleges specifically that:

"the appropriation and the proceedings for the appropriation of plaintiff's said described property are without authority and prohibited under the law, same being an attempt to forcibly take the property of the plaintiff municipality now devoted to or for the above alleged municipal uses under the assumed superior right of eminent domain, which the defendant the Board of County Commissioners does not have under the statutes of the State of Ohio."

The Village in addition asserts that there are other sites available to the County but that there is no other property as economical in price and suitable for the plaintiff's needs as the plaintiff's above described property, that it has no adequate remedy at law, and that unless the Board of County Commissioners are enjoined the Village will be irreparably damaged.

In their answer the Commissioners admit that the Village has acquired the property, that on June 28, 1956, the Commissioners adopted a resolution declaring their intention to appropriate the plaintiff's property and admit the further resolution directing the bringing of the appropriation action and the filing of the action, cause No. 692,840 in this court.

After denying all allegations not admitted to be true the Commissioners assert a second defense. The allegations of the second defense deal with two matters. The Commissioners assert that on June 28, 1956, they adopted a master plan for the improvement of the county airport and determined to proceed with the improvement of said airport in accordance with said master plan and - - -

"that said plan provided, among other things, for the immediate construction of a new paved and lighted 4,000 foot northeast-southwest runway for said county airport."

The Commissioners further aver that the plaintiff Village through its elected officials had knowledge for a long period of time and on and prior to June 28, 1956, of the plans of the County Commissioners to improve the County Airport, adopt a master plan, and construct the paved and lighted 4,000 foot northeast-southwest runway aforesaid.

The Commissioners specifically state—

"that although the plaintiff through its officials, and particularly the mayor and council thereof, knew that the defendant Board of County Commissioners planned to acquire the land in the petition described, it nevertheless on June 25, 1956, acquired the land in the petition described for the alleged purposes set forth in the petition, fraudulent, in bad faith, and as a subterfuge for the sole purpose and with the intent and design of hindering, delaying and preventing the defendant Board of County Commissioners from making the said appropriation of the property."

The Commissioners complete the allegations relating to the first matter with this statement:

"Defendants further aver that plaintiff has no intention of using the said land for the purposes set forth in the petition, and that all of the facts of the plaintiff with respect to the acquisition of said land

with respect to these proceedings are solely designed with the object and intent of obstructing the County in its improvement and expansion program, essential and vital to the use and operation of the County Airport."

The second matter alleged in the second defense pleads the stress of public necessity:

"Defendants aver that the parcel of land in the petition described and acquired by plaintiff, and appropriated by the defendant County Commissioners, is immediately in the path of the construction of the proposed runway, is necessary and vital for the construction of said 4,000 foot northeast-southwest runway in order to meet the specific requirements of the Civil Aeronautics Administration; and that such runway can be practically built and accomplished in no other way than by the appropriation of plaintiff's said property; that said airport cannot be moved from its present location, and that the stress of public necessity requires the acquisition of plaintiff's said property."

The reply of the Village generally denies the foregoing affirmative allegations of the Commissioner's answer.

In a supplemental petition the Village avers that at the election held November 4th, 1958, the voters of the Village approved the issuance of $175,000 in bonds to finance the construction, furnishing and equipping of a fireproof Village Hall to house the regular administrative departments of the Village, including the Police and Fire Departments of the Village. The facts of the election are not denied by any subsequent pleading, and are established by the evidence.

Acquired in 1946, the Airport has been continuously operated by the County since May 30, 1950. The original turf runways, two in number form an X pattern. Approximately 2800 feet long, each is still operated today, together with a paved taxi strip connecting the southerly ends of the turf runways.

By resolution adopted in December of 1951, and October of 1952, the Council of the Village determined "to oppose any expansion of the Cuyahoga County Airport." These resolutions are still in effect.

On January 11, 1954, the County Commissioners adopted a resolution designating Cuyahoga County Airport as a "Feeder Airport." A "Feeder Airport" is an intermediate airport designed to accommodate airplanes of a gross weight of 10,000 to 50,000 pounds. It serves all types of single engine aircraft up to and including four seats and the smaller category of twin engine airplanes.

The Commissioners thereafter ordered the County Engineer to proceed with the preparation of a Master Plan with the help of consultants.

In 1951 Village officials looked into the possibility of purchasing for municipal purposes, the Swetland, and then later the adjoining Williams property. Their next effort to obtain land was not until 1956 when they considered the Bernsteen property but they decided the price per acre was too much. This property, since acquired by the County in its appropriation suit, lies between the old southern boundary of the Airport and the Speyer property.

The minutes of the Council meeting of February 20, 1956, reveal

that a "lengthy discussion was held on a Village Hall building with architects;" and also they show that "Mr. Opalich discussed need for more property for recreation, ball diamonds and swimming pool at a later date."

Negotiations for the purchase of the Speyer property began in February of 1956, according to the Village solicitor, Roland Berg. He testified that he observed a for sale sign on the property and contacted the listed agent, and thereafter 6 or 10 contacts took place between himself and the agent.

On April 4, 1956, the consultant submitted his report on a Master Plan Study for the Cuyahoga County Airport and the County Engineer Albert S. Porter who in turn submitted it with approval to the Commissioners on May 29, 1956.

May 17, 1956, Mayor Wills, on stationery of the Village, wrote the Commissioners saying—

"I would like to request a copy of the Master Airport Plan submitted to you about April 4th, 1956."

He stated further—

"We are very concerned in our area and would like an opportunity to discuss it with our Hilltop Mayors."

Four days later, on May 21, 1956, the minutes of a Council meeting held on that date show—

"A further discussion was held on the location and purchase of a site for a Village Hall and Recreation Center."

Solicitor Berg believes that he took up the matter of purchasing the Speyer property at a council meeting held on the third Monday in May of 1956, and fixes this as the date when he reported the price at which the Speyer property could be purchased. Presumably this would have been the May 21, 1956 meeting.

Under date of June 6, 1956, the Commissioners transmitted to Mayor Wills a copy of the "Master Plan Study," together with a copy of a report from the County Engineer,—

"Which have reference to the proposed expansion of the present facilities at the Cuyahoga County Airport."

The letter of transmittal also notified him that—

"a discussion leading to the final determination as to approval will be had on Monday, June 11th, 1956, at 11:00 A. M., in the offices of the Commissioners."

On June 8, 1956, Mayor Wills of the Village wrote the Commissioners acknowledging receipt of the "Master Plan Study" together with the County Engineer's supporting report. Speaking for an East Side Mayors' Group, Mayor Wills requested a postponement of the June 11th meeting, to a date three to four weeks later. He reported that the copy was received on the 8th of June and stated—

"For that reason we would like about three to four weeks to study the plans and have a meeting with our Mayors before we meet with you."

The Commissioners, by letter dated June 12, 1956 informed Mayor Wills that—

"The Board of County Commissioners, acting upon your request

for postponement of the hearing in regard to expansion of Richmond Road Airport, has extended the date to June 25th, at 11:00 A. M."

The letter further reported that the hearing originally scheduled was held and—

"was attended by a large representative group consisting of businessmen, civic organizations and aviation groups, all of whom expressed themselves overwhelmingly in favor of approval of the report."

At the June 18th Council Meeting the Village Council passed an ordinance, declared to be an emergency, providing for the purchase of the Speyer property for $27,025.00, and at the same time passed another ordinance which amended the Village budget to include this expenditure. The ordinance authorized purchase of the property "for use for Municipal Buildings, and Village Recreation Center and Park Purposes."

On June 25th, a purchase and sale agreement was executed between the Village and the Speyers providing for the sale of the 23-acre parcel to the Village.

On the same day, June 25th, a warranty deed to the property conveying title to the Village was executed and delivered to Solicitor Berg. Then on June 27th the deed, the purchase agreement and the check were placed in escrow with Land Title Guarantee & Trust Company.

Also on June 25th the Commissioners held the second public hearing on the Master Study Plan. Mayor Wills, President of Council Opalich, and others from Richmond Heights appeared at such hearing to voice their objections to the proposed expansion of the County Airport.

On June 28th, 1956, the next day after the Speyer papers were placed in escrow, the Commissioners adopted two resolutions relating to the expansion of the County Airport.

The first resolution accepted and approved the Master Plan and Engineering Report for the Cuyahoga County Airport together with the recommendation of the County Engineer contained in his letter of May 29, 1956. The second resolution declared an intention to appropriate property required for public use. It described 18 parcels, one of which was the Speyer property.

Title to the Speyer property was recorded in the name of the Village on July 13, 1956.

A copy of the Commissioners' resolution declaring an intention to appropriate was served on the Village August 14, 1956.

The later resolution directing the County Prosecutor to proceed with appropriation, and his bringing of the appropriation action on January 30, 1957, have already been noted.

From the foregoing it is readily observed that in the trial of this action we are confronted with the perplexing problem of the relative rights of two agencies having and attempting to exercise the power of eminent domain. By statute, County Commissioners have the power to establish airports, landing fields or other air navigation facilities (including new runways as "structures * * * used or useful as an aid to the safe taking off, navigation, and landing of aircraft." Sec. 4561.01 R. C.), either within or without the limits of a municipal corporation. Secs. 307.20, 717.01 (V), 719.01 (O), 4561.01 R. C. Municipalities likewise have statutory power to acquire by purchase or condemnation real

estate for municipal purposes, including recreational and park purposes. Chapters 717 and 719 R. C.

As a general rule, property already devoted to a public use cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication, mere general authority to exercise the power of eminent domain being in such case insufficient regardless of whether the property was acquired by condemnation or purchase. 29 C. J. S. 861. Railroad v. Dayton, 23 Oh St 510; Cincinnati v. Railroad, 88 Oh St 283, 293-295, 102 N. E. 951; Board of Education of Akron v. Cemetery, 110 Oh St 430, 144 N. E. 113; Cf. 18 Amer. Juris. 723; 1 Nichols on Eminent Domain, No. 2.2; 19 O. Jur. 2d 455-456.[1] When power to appropriate is granted only in general terms, land exempt from appropriation by reason of its prior dedication to a public use cannot be taken under such general power, and injunction will lie in a proper case to prevent appropriation of grounds held, used, or occupied as a cemetery whether the specific land has been used for burial or not. Board of Education v. Cemetery, supra. On the other hand, it has been held that land held by a railroad corporation, whether acquired by purchase or appropriation, which is not employed in, nor needed for the proper exercise of its corporate franchises, is not within the reason or operation of the rule that property already lawfully appropriated cannot be taken for another public use. Railroad v. Belle Center, 48 Oh St 273, 27 N. E. 464. Ordinarily the power to take by "necessary implication" is to be derived from the language employed in the statute. But in resolving the question of whether or not the power has been granted by necessary implication, resort may be had to the legislative intent as evidenced by a consideration of the statute with relation to its subject matter. 1 Nichols on Eminent Domain 2.2(1), p. 142. Thus, when the only land available for a particular public work is already devoted to the public use, the power to take it may be inferred from a comparison of the conflicting powers conferred by the statute as well as the nature of the public works respectively to be undertaken. Cf. Old Colony Rd. Co. v. Framingham Water Co., 153 Mass., 561, 27 N. E. 662, 13 L. R. A. 332; Pittsburgh etc. Ry. Co. v. Sanitary Dist., 128 Ill., 286, 75 N. E. 892, 2 L. R. A. (n. s.) 226; Matter of Application of Mayor of New York, 135 N. Y. 253, 31 N. E. 1043; Imperial Irrigation Co. v. Jayne, 104 Tex., 395, 138 S. W. 575. As said in the opinion in Railroad v. Belle Center, 48 Oh St 273, 293-294: Whether municipal corporations, under §2232 R. S. (authorizing, in general language, any city or village "to enter upon and hold real estate within its corporate limits" for necessary offices "and for prisons") can appropriate lands owned by a railroad company, within their limits, for any of the specified uses, must depend upon the circumstances of each case, the criterion in all cases being, whether such appropriation is

---

1. For example of statute wherein statutory power is expressly granted, see §6101.17 R. C., and where power is expressly limited see §§1545.11 and 1545.14 R. C., referred to in the opinion of Hurd, J., in Gates Mills v. Park Commissioners, 33 Oh Ap 8.

reasonably consistent with the use to which the property has been subjected by the railroad company and whether it is so consistent, may in each case, become a question of fact. The judgment of the circuit court dissolving the injunction sought by the railroad was affirmed.

See also Denver Power etc. Co. v. Denver etc. Rd. Co., 30 Colo. 204, 69 P. 568; Denver v. Arapahoe Co., 113 Colo. 150, 156 P. (2d) 101; Beth Hagadok v. Aurora, 126 Colo. 273; Snellen v. Brazoria Co. (Texas, 1949) 224 S. W. (2d) 305; Weehawken v. Erie Rd., 20 N. J. 572, 120 A. (2d) 593; Contra: Vermont Hydroelectric Corp. v. Dunn (Vermont, 1921), 112 Atl. 223, 12 A. L. R. 1495. These cases outside Ohio apparently adopt the doctrine that equity will compare and weigh the greater or more paramount necessity of the conflicting appropriations which we are disinclined to follow herein, except as such factors may be pertinent in the application of the so-called balance of convenience rule. **Cf. Injunctions, 29 O. Jur. (2d) 38.**

We therefore conclude that the municipality and the county have coequal rights conferred by law to appropriate property for municipal recreational and park purposes on the one hand and for an airport or the extension thereof on the other. It may be logically contended that having equal powers, the rule of first in time, first in right, would apply. Thus it has been held that in a condemnation proceedings where a telegraph company and a railroad sought to locate a line over the same ground, the one who first located the line had the preference. Western Union, etc. Co. v. Louisville, etc. R. Co., 270 Ill. 399, 110 N. E. 583; State, ex rel. v. Pierce County Super. Ct., 53 Wash. 321, 101 P. 1094; Carolina & Tenn. Power Co. v. Des Moines etc. Rd. Co., 246 Iowa, 874, 68 N. W. (2d) 320 (Injunction granted). See also 1 Nichols, p. 148, and cases cited in footnote 86. It has also been held that the first location, if followed by construction, operates to secure the prior right. State v. Stevens Co., Sup. Ct. 46 Wash. 500, 90 P. 650. But for the reasons hereinafter given, a majority of this court does not believe that the fact that the plaintiff acquired the property prior to the commencement of the appropriation proceedings necessarily determines the right of the plaintiff to complete relief by way of enjoining such proceedings in their entirety.

Plaintiff, whose responsible officials had full knowledge of the proceedings of the defendants contemplating the expansion of the airport, nevertheless elected to purchase the Speyer property and now seek to invoke the aid of a court of equity to defeat the expansion of the airport.

In granting or refusing an injunction, a court of equity is guided by certain fundamental rules.

1. An application for an injunction is addressed to the sound discretion of the court. And ordinarily the burden is upon the plaintiff to make a showing that will recommend itself to the conscience of the chancellor that the relief sought is just and equitable. When this burden has not been met, the relief sought may be denied. Cf. National City Bank v. Gelfert, 284 N. Y. 13, 29 N. E. (2d) 449.

2. Regard must be had not only for the rights of the plaintiff sought

to be protected and enforced, but also for the consequences resulting to the defendant from the granting of the injunction. **State, ex rel. v. Court of Appeals, 104 Oh St 96, 134 N. E. 377,** quoting from Russell v. Farley, 105 U. S. 433. **Cf. Injunctions, 29 O. Jur. (2d) 38.** In other words, in passing on the application for injunction, a court of equity will balance the relative conveniences of the parties, and it has been stated that the plaintiff must show that his inconvenience or injury if the injunction is denied will exceed that of the defendant if it is granted. Hence, it is said that the injunction should be denied if the inconvenience seems equally divided between the parties. **29 O. Jur. (2d) 407.**

3. In granting an injunction, a court of equity may attach thereto terms and conditions designed to serve the ends of justice and to protect the rights of all parties in interest. This principle was announced with regard to the imposition of terms and conditions as a condition precedent to the taking effect of an interlocutory order, but there is no sound reason why it should not be applied with equal force to the granting of a permanent injunction. State, ex rel. v. Court of Appeals, supra.

Upon the evidence, we further find:

1. That the Council of the plaintiff since 1951 has consistently opposed the expansion of the airport.

2. That the present quarters for a Town Hall and other municipal services is wholly inadequate and that location of such buildings on the Speyer property is presently reasonably necessary.

3. To the extent that the land purchased represents property needed to provide for the construction of a Town Hall and other municipal buildings, the intention of the village in acquiring same is bona fide.

4. We find no fraud on the part of the plaintiff in acquiring the property, but we are not convinced that the expansion of the purpose of the acquisition of the property to include a recreation center was not influenced or induced by a desire to thwart the acquisition of the property by the defendants. The evidence exhibits no proof of any intention prior to May 21, 1956, to purchase the Speyer or any other property for the development of recreational purposes. In his testimony, the Mayor in referring to other tracts under consideration, expressed the falacious idea that such portions thereof as would not be used for building purposes could be resold for residential purposes.

5. The evidence reflects a lack of any present bona fide intention to develop the property as a village Recreational Center within the reasonably foreseeable future, and that its development is to some extent contingent on future highway improvements. No plans have been made and no steps taken to finance any future development. The $175,000 bond issue approved in 1958 is exclusively for municipal buildings.

6. The evidence is not convincing that other possible sites for recreational development are not available to plaintiff.

7. The county is faced with the alternative of abandoning the airport and selling the property or improving it to a standard which will provide the needed community airport facilities, including the extension of the runways. Upon the record, the defendants, in resolving to appro-

priate land to expand the airport, have not acted in bad faith nor abused their discretion.

8. The airport is permanently located and immovable. The runways manifestly cannot be shifted nor relocated. The major portion of the Speyer property is necessary for the extension of the runway.

Giving full consideration to the evidence and seeking to make an equitable adjustment of the rights of the contending parties, a majority of the court find that the plaintiff has failed to show (1) a clear right to relief with respect to that portion of the property not required by it for its munincipal buildings; (2) that the injury with respect to the use of the property for recreational purposes if the injunction is denied will exceed that of the defendant were it to be granted.

We therefore conclude, as did the trial court, an appropriate injunction should be granted the plaintiff enjoining the defendant from appropriating so much of plaintiff's property as shall be reasonably necessary for the construction of a Village Hall and appurtenant purposes as described in the journal entry approved by the Common Pleas Court. Each party to pay its respective costs.

YOUNGER, J, concurs.
GUERNSEY, J, dissents.

## DISSENTING OPINION

By GUERNSEY, J.

I regret that I am unable to agree with some of the conclusions of my associates although I am in accord with them as to the judgment which should be rendered.

I am in full agreement with the statement of facts and the general observations of law in the majority opinion to and including the statement that "as a general rule, property already devoted to a public use cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication, mere general authority to exercise the power of eminent domain being in such case insufficient regardless of whether the property was acquired by condemnation or purchase." Had the majority proceeded from that point and concluded that a legislative grant of the power to appropriate property for the operation of an airport, implies, by reason of the nature of an airport, the right and authority to appropriate all land determined to be reasonably necessary to such operation, whether or not first devoted to another public use, I might have found more common ground for agreement.

I am further in agreement with the statement in the majority opinion that "when the only land available for a particular public work is already devoted to the public use, the power to take it may be inferred from a comparison of the conflicting powers conferred by the statute as well as the nature of the public works respectively to be undertaken," but this is merely another way of saying that the paramount or superior power of appropriation may be derived only from the statute.

I part company with the majority with respect to recognizing in Ohio any so-called balance of convenience rule, either unsullied, or, as affected by a "doctrine that equity will compare and weigh the greater or more paramount necessity of the conflicting appropriations," if such doctrine does in fact exist. I note with respect to the cases cited as authority for this doctrine that in the case of Denver Power etc. Co. v. Denver etc. Rd. Co., 30 Colo., 204, 69 P., 568, the court specifically declined to apply the doctrine of "comparative convenience" and concluded that the land to be taken was not being devoted to a public use; in the case of Denver v. Arapahoe Co., 113 Colo., 140, 156 P. (2d), 101, involving several parcels of land, the Court said that any issue as to balance of convenience was not then before the Court and reserved such issues to the trial court in the appropriation case involving each respective parcel of land; in the case of Snellen v. Brazoria Co. (Texas), 224 S. W. (2d), 305, the suit was between a governmental subdivision and individuals who were presumed to hold title to the center of a street, was not between two parties, each invested with the power to appropriate, and the court concluded that "after more than fifty years, no steps have been taken · to create the 'esplanade,' or to make it a part of the town's park system," or, in other words, that the land was not being devoted to a public use; and in the case of Weehawken v. Erie Rd., 20 N. J., 572, 120 A. (2d), 593, the Court concluded that "the intended use by Erie of (part of the property) is a public railroad use and that it is sufficiently imminent to deny an exercise of the condemnation power to the extent contended for by Weehawken," but "that Weehawken may condemn (the balance of the property) because by the very admissions of Erie it is not now intended nor authorized to be used for railroad purposes." In this latter case the only "balance of convenience" actually recognized was in permitting Weehawken to condemn a narrow passageway over one end of the property to be retained by Erie so that the Weehawken property would not be landlocked, but it might be noted that this did not prevent Erie from using the balance of the retained property for its intended use as a railroad-truck terminal. I am unable to comment on the case of Beth Hagadok v. Aurora, 126 Colo., 273, as it is not immediately available to me.

I cannot agree with the majority in its holding that, in effect, the same principles of equity apply in a case where an injunction against an appropriation is sought as apply in other cases where injunction is sought. To apply the principles here, as the majority seeks to do, that an application for an injunction is addressed to the sound discretion of the court and that in passing on the application for injunction a court of equity will balance the relative conveniences of the parties, results in the party seeking appropriation being granted on equitable principles alone, the right to continue an action to appropriate property which right is not bestowed on such party by the Constitution or laws of Ohio. The Constitution and laws of Ohio have never bestowed upon the Courts of Ohio, in an action such as this, the right to seek or to make "an equitable adjustment of the rights of the contending parties."

In effect the majority is saying that as between two governmental

subdivisions, with equal constitutional or statutory authority of appropriation, and neither having by law the specific or implied authority to appropriate from the other, regardless of the fact that the first governmental subdivision has purchased the property for its governmental uses, if the other governmental subdivision wants the property for a public use, it shall have it unless the first governmental subdivision can show that it needs the property more than does the second.

This doctrine I cannot agree with, for without legislative sanction, and by pure judicial decree, such doctrine would, more often than not, permit an expanding political subdivision, with great planning and financial resources, to plunder the small political subdivision, without such resources, but which wanted to do for its residents as it saw best without being able to prove and paramount necessity therefor.

The Supreme Court of Ohio held in the case of Giesy v. C., W. & Z. R. R. Co., 4 Oh St 309:

"The power (of eminent domain) is an inseparable incident of sovereignty, and its exercise, for the accomplishment of lawful objects, is conferred upon the general assembly in the general grant of legislative authority."

"It may be exercised directly or indirectly by the general assembly, without the intervention of the judiciary, except for determining the amount of compensation. But the courts possess full power to determine its proper limits, and to prevent abuses in its exercise."

"The power rests upon the public necessity, and can only be exercised where such necessity exists."

"But this necessity relates rather to the nature of the property, and the uses to which it is applied, than to the exigencies of the particular case; and it is no objection to the exercise of the power, that lands equally feasible, could be obtained by purchase." (Emphasis added.)

And in Sec. 1879, Chapter XX, Pomeroy's Equity Jurisprudence, Second Edition, 4257, it is said:

"It has come to be generally recognized that injunction against the unlawful or improper exercise of the power of eminent domain constitutes an independent head of equity jurisdiction, uncontrolled in its exercise by the principles which regulate injunctive relief against trespass. The constitutional guaranty that 'property shall not be taken for public use without just compensation' by agents of the state to whom this power is delegated, is deemed to establish a right of so high and sacred a character that any threatened infringement of the right should be restrained, without consideration of the inadequacy of the legal remedy. Injunction, in this class of cases, is a matter of strict right, not of equitable discretion; although it is true that special equities, such as acquiescence or estoppel, may constitute a defense . . . The fundamental principle now generally accepted is well expounded in the following extract from the opinion of a most able court, . . . (East & West R. Co. of Alabama v. East Tennessee, V. & G. R. Co., 75 Ala. 280, by Brickell, C. J.): 'The principle upon which a court of equity proceeds, in interfering to prevent bodies corporate having compulsory power to enter upon, take, and appropriate for their own uses the lands of others, differs materially from the principle upon which it intervenes to prevent the commission

or continuance of waste, or of nuisances, or of trespasses, when only private rights, or the acts of persons, natural or artificial, not having such powers, are involved. In the latter class of cases, if the right be strictly legal, and there is no relation of privity between the parties, it is of the essence of the jurisdiction of the court that a case of irreparable injury should be shown—a case for which the courts of law do not furnish an adequate remedy . . . It is most essential to the preservation of the rights of private property, to the protection of the citizen, and to the preservation of the best interests of the community, that all who are invested with the right of eminent domain, with the extraordinary power of depriving persons, natural or artificial, without their consent, of their property, and its possession and enjoyment, should be kept in the strict line of the authority with which they are clothed, and compelled to implicit obedience to the mandates of the constitution. A court of equity will intervene to keep them within the line of authority, and to compel obedience to the constitution, because of the necessity that they should be kept within control, and in subjection to the law, rather than upon the theory that they are trespassers, or that the injury which they are inflicting is irreparable. The owner of the land has the right to say that, unless they keep within the strict limits prescribed by law, they shall not disturb him in the possession and enjoyment of his property. The power is so capable of abuse, and those who are invested with it are often so prone to its arbitrary and oppressive exercise, that a court of equity, without inquiring whether there is irreparable injury, or injury not susceptible of adequate redress by legal remedies, will intervene for the protection of the owner.'" (Emphasis added.)

It is also well established in Ohio that equity will not intervene, except in a very limited way, to determine the necessity of any appropriation. Thus in the case of **Emery v. City of Toledo, 121 Oh St 257,** the Supreme Court held:

"1. In appropriating private property to municipal uses, **the determination of the municipality of the fact and extent of the public need** and the uses to which the property shall be subjected **is legislative and political,** and may not be questioned in the appropriation proceedings against the property owner." (Emphasis added.)

\* \* \*

"3. An owner whose property is being appropriated by a municipality may, at any time before the issue of value is determined, invoke the aid of a court of equity to determine whether the use is a public one, or whether the municipality in its legislative proceedings has complied with reasonable strictness with the statutes whereby the power to appropriate is conferred, **or whether the municipality is acting in good faith or abusing its power.**" (Emphasis added.)

See also **Sargent v. Cincinnati, 110 Oh St 444.**

Thus, any attempt by the majority to "make an equitable adjustment of the rights of the contending parties" would, in the opinion of this writer, be an invasion of the legislative and political determination of the Board of County Commissioners of Cuyahoga County that the

appropriation of the land in question was necessary, and would be contrary to the views expressed above by the Supreme Court.

On the facts of this case the author of this opinion is more concerned with the question of whether the plaintiff municipality has devoted the land in question to a public use. If it has not done so then the use of the land in question is not a public use and under the authority bestowed upon it by law, Cuyahoga County would be able to appropriate the land from the municipality as though it were privately owned and devoted to a private use. This question involves, of course, a determination of whether land earmarked for a public use, although not physically so used, may be considered devoted to a public use, and, if so, what actions by a municipality shall constitute sufficient earmarking for public use.

It is apparent that if, as in the case of **Railroad Co. v. Village of Belle Centre, 48 Oh St 273**, the land held by the municipality "is not employed in, nor needed for the proper exercise of its corporate franchises," it is not sufficiently earmarked for public use to be exempt from appropriation by the County. The best discourse that I have been able to find on the matter of public use is contained in the case of Vermont Hydro-Electric Corporation v. Dunn, 112 A. 223, decided by the Supreme Court of Vermont in 1921, wherein Judge Taylor says in his opinion:

"And it is not necessary that the property be actually in use for the public purpose to exempt it from the proceeding. In other words, it may be appropriated or devoted to a public use within the law of eminent domain without being actually put to such use . . . The test whether land is held for a public use such as will exempt it from condemnation is said not to be what the owner does or may choose to do, but what under the law he must do, and whether a public trust is impressed upon it . . . While land kept by a corporation bound by law to serve the public in reasonable anticipation of future needs cannot be seized for a different public use under general authority, land held for purposes other than those pertaining to its franchise may be taken as freely as from a private individual . . . The element of necessity plays an important part in the determination of the question. While liberal consideration should be given to the future as well as the existing needs of the corporation, the exemption will not extend to property held for future use upon the mere possibility that it may at some future time become necessary to the exercise of its corporation franchise. **Reasonable expectation of future needs is required to protect the property from condemnation** . . . The court must deal with conditions that exist at the time the condemnation is asked . . . Nor is the exemption indefinite in point of time, but the property must be subjected to the use for which it is held within a reasonable time."

"**The general rule to be gathered from the authorities is that property is devoted to or held for a pulic use, so as to be exempt from condemnation for a different public use under general authority, when used in immediate and necessary connection with a public trust, or when acquired by a public service corporation for a necessary purpose pertaining**

**to its franchise and held in reasonable anticipation of its future needs, with a bona fide intention of using it for such purpose within a reasonable time."**

I believe that this is a sound statement of the law applicable to the situation before us. It may be gathered from these various authorities that even in a proper case equity will not probe the appropriating governmental subdivision's necessity for the appropriation unless the evidence pertaining to necessity would also show that the such subdivision is acting in bad faith or abusing its power. However, to determine whether or not the land concerned is devoted to a public use, equity will consider whether or not the land held by the subdivision from which appropriation is sought for future use is held by such subdivision in **necessary** connection with a public trust. To these limits, and to these only, necessity becomes involved, and equity will not "compare and weigh the greater or more paramount necessity of the conflicting appropriations," nor will it "make an equitable adjustment of the rights of the contending parties."

In the instant case we have no claim by the municipality that the county is acting in bad faith or that, if it has the power to appropriate, such power is being abused, so whether the appropriation by the County is necessary to the County is not at issue. Nor is there any question of the statutory right of the municipality to use all of the land in question for the purposes which it contemplates.

Tested by the general rule set forth in the Vermont Hydro-Electric Corporation case, supra, I am of the opinion that to the extent that the land in question is needed to accommodate the structures contemplated by the bond issue approved by the electors of plaintiff municipality the said municipality has shown by the requisite degree of proof that said land will be used in immediate and necessary connection with a public trust and is therefore, in legal effect, devoted to a public use and thus exempt from condemnation for a different public use by defendant County. However, since there is no convincing evidence that the balance of the land is being presently used for public purposes or will be used for park and recreational purposes, or any other public purpose, at any particular time in the future then there is no showing of a bona fide intention of using the balance of the said land for such purposes within a reasonable time. Such being the case, that part of the land not needed to accommodate the structures contemplated by the bond issue, is not exempt from appropriation by the County for its legitimate public purposes, and to that extent the injunction should be denied.

Taking this view of the case I cannot concur in the first, second, fourth, sixth, seventh, and eighth findings of the majority opinion for the reason that in my opinion such findings are not relevant to the issues made by the pleadings and the evidence, but I do concur with the majority as to the nature and extent of the injunction to be granted.