**BRAKEFIRE, INC., d.b.a. Silco Fire Protection Services, Plaintiff,**

v.

**OVERBECK et al., Defendants.**

2007-Ohio-6464.]

Court of Common Pleas of Ohio,
Clermont County.

No. 2007 CVH 01087.

Decided Aug. 13, 2007.

36

38

40

42

44

Dinsmore & Shohl, David A. Nenni, and Michael S. Glassman, for plaintiff.

Patrick Kasson and Gregory D. Brunton, for defendants.

HADDAD, Judge.

{¶ 1} This matter came before the court on July 13, 2007, pursuant to a motion for a preliminary injunction filed by the plaintiff, Brakefire, Inc., d.b.a. Silco Fire Protection Services ("Silco"). The court took the matter under advisement, and upon consideration of the motion, the record of the proceedings, the oral and written arguments of counsel, the evidence presented, and the applicable law, the court now renders the following decision.

## FINDINGS OF FACT

{¶ 2} The defendant Sean Overbeck was employed by Silco in September 1993 and signed an employment agreement with Silco on September 8, 1993. The agreement reads as follows:

NOW, **THEREFORE**, in consideration of the covenants and agreements herein contained, the Employer and Employee agree as follows:

1. *Employment*

Employer and Employee hereby agree that Employee shall be employed in such capacity and at such salary and other compensation may be from time mutually agreed upon between them, all of which shall be confirmed by letter from Employer upon written request of Employee.

\* \* \*

4. *Covenant To Compete*

Employee expressly agrees that he will not, for a period of twenty-four (24) months after the expiration or termination of this Agreement, or any renewal thereof, directly or indirectly, either as principal, agent, employee, employer or

in any other individual or representative capacity whatever, engage in the occupational activity of selling, soliciting or promoting the sale of, or servicing after sale, or supervising others in selling, soliciting or promoting the sale of, those products and services which such Employee promoted, sold, delivered, provided or supervised while in the employ of Employer, including, without limitation, fire extinguishers, fire hoses, fire extinguisher cabinets, dry chemical $CO_2$ or Halon fire extinguishing systems and smoke detection systems, as hereabove described.

This covenant not to compete shall apply within those areas of Ohio, Kentucky and Indiana or any other state(s) where the Employee was engaged for Employer in any of the businesses referred to in this Agreement during the term of his employment hereunder.

5. *Covenant Not to Disclose Confidential Information*

Employee agrees that his employment by Employer will acquaint him with certain confidential information concerning the conduct of Employer's business including, but not limited to, route lists, cards and other memoranda of customers' names and addresses, prices, costs of doing business and other financial information, as it may exist from time to time, is a valuable, special and unique asset of Employer's business. Employee will not, during or for a period of thirty-six (36) months after the term of his employment disclose said information or list of Employer's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever.

{¶ 3} Overbeck was employed by Silco from September 1993 until February 2007. At the time he left Silco, Overbeck was the systems manager for suppression systems in Silco's Cincinnati office. Upon leaving Silco, Overbeck went to work for a Silco competitor known as Tomco. James Fraser, Silco's president, expressly permitted Overbeck to work for Tomco and made no effort to enforce the covenant not to compete.

{¶ 4} The defendant Robert Callihan was employed by Silco in June 1995 and signed an employment agreement with Silco on June 12, 1995. His employment agreement was similar to that of Overbeck's, with the following exception:

*Employment*

Employer and Employee hereby agree that Employee shall be employed in such capacity and at such salary and other compensation *as* (emphasis added) may be from time mutually agreed upon between them, all of which shall be confirmed by letter from Employer upon written request of Employee.

{¶ 5} Callihan was employed by Silco from June 1995 until March 2007. At the time he left Silco, he was the systems manager for suppression systems in Silco's Columbus office.

{¶ 6} The defendant Rod Bishop was employed by Silco in October 1988 and signed an employment agreement with Silco on October 11, 1988. The pertinent parts of Bishop's agreement were identical to those found in Callihan's agreement. Bishop was employed by Silco from October 1988 until April 2007. At the time he left Silco, he was the general manager for Silco's Columbus office.

{¶ 7} After resigning from Silco, Overbeck, Callihan, and Bishop together formed a company named Elite Fire Services, L.L.C. ("Elite"). At the time the company was formed, Overbeck was working for Tomco, but he left Tomco to open Elite with the other defendants. Elite was registered with the Ohio Secretary of State's Office on April 10, 2007. The purpose of Elite is "to provide services and products for fire protection * * *." Elite's statutory agent is Robert Callihan, and its authorized agents are Rod Bishop and Sean Overbeck.

{¶ 8} On June 20, 2007, Silco filed a verified complaint for temporary, preliminary, and permanent injunctive relief, and other damages. In its complaint, Silco asserts that the individual defendants had had direct access to and had gained knowledge of Silco's confidential information, including route lists, cards, and other memoranda of customers' names and addresses, prices, costs of doing business, and other financial information. Silco further states that the defendants had access to Silco's confidential customer list, which contains each customer's name and address, telephone contact person, number of fire extinguishers, and dates of last inspection. Silco also asserts that the defendants received training materials developed and implemented by Silco to assist Silco employees with sales techniques and methods. According to the plaintiff, these materials were not available to the public.

{¶ 9} Silco further argues that Elite is in direct competition with Silco, thus putting the defendants in violation of their covenants not to compete. In support of this argument, Silco points to Elite's website, http://elitefire.org/home, which states, "[W]e test and inspect fire extinguishers, kitchen suppression systems, clean agent suppression systems, dry chemical suppression systems, sprinkler systems, fire alarm systems, fire pumps, backflow devices, exit lighting and kitchen hood cleaning." These are services that are also provided by Silco, with the exception of kitchen-hood cleaning. On June 8, 2007, Silco sent letters to Overbeck, Callihan, and Bishop informing them that by forming and operating Elite, they were in violation of their covenants not to compete.

{¶ 10} The plaintiff's request for a preliminary injunction is based upon three separate causes of action: misappropriation of trade secrets, a violation of R.C. 1333.61 to 1333.69; breach of contract, including breach of the covenant not to

compete and breach of the covenant not to disclose confidential information; and tortious interference with contracts and/or business relationships.

{¶ 11} For purposes of this preliminary-injunction hearing, the defendants have stipulated that they are competing with Silco. Further, the defendants admitted at the hearing that they have quoted services for three Silco customers, Hilliard Schools, Worthington Schools, and Ohio State University, and have attempted to obtain the business of another Silco customer, Smurfit–Stone. The defendants argue, however, that they were relieved from their obligations under the agreement with Silco because Silco was in material breach of the agreement. The defendants argue that Silco materially breached Paragraph 1 of the agreement, which provides that the employees shall be employed at a compensation that may be mutually agreed between them, by unilaterally changing their compensation structure in January 2007. It was because of this unilateral change that the defendants left the plaintiff's employ.

{¶ 12} Further, the defendants argue that they did not misappropriate trade secrets. The defendants assert that no route lists, cards, and memoranda of customers' names and addresses, prices, financial information, and training materials were taken when they left Silco.

{¶ 13} A temporary restraining order was filed in this case on June 20, 2007. Pursuant to that order, the defendants were restrained from (1) breaching or encouraging the breach of the covenants not to compete, (2) breaching or encouraging the breach of the covenants not to disclose confidential information, (3) using Silco's confidential information/trade secrets in the operation of the defendants' business, (4) breaching or threatening to breach any other provision of the employment agreement, (5) copying, transferring, destroying, manipulating, disposing of, or in any way altering any property (including data, software, files, programs, or any related or unrelated items, whether or not the defendants claim an ownership interest therein) removed from Silco's premises before, after, or at the time that the defendants left Silco's employ, and (6) transferring manipulating, destroying or disposing of any device or instrument (including photographs, notes, drawings, and the like) on which said property was stored or from which said property was transferred. A hearing on the preliminary injunction was scheduled for June 29, 2007, within 14 days of the granting of the temporary restraining order ("TRO") as required by Civ.R. 65. The parties agreed, however, to continue the hearing and the TRO until July 13, 2007, and an agreed entry to this effect was submitted on July 2, 2007. The hearing was held on July 13, 16, and 17, 2007, and an agreed order was submitted extending the TRO until August 1, 2007. The parties submitted a second agreed order extending the TRO on August 2, 2007, which extended the TRO until August 13, 2007.

## THE LEGAL STANDARD

{¶ 14} " 'The authorities are agreed that injunction is an extraordinary remedy equitable in nature, and that its issuance may not be demanded as a matter of strict right. An application for an injunction is addressed to the sound discretion of the court, * * * and its allowance is a matter of grace.' " *Hritz v. United Steel Workers of Am., AFL–CIO,* Warren App. No. CA2002–10–108, 2003-Ohio-5284, 2003 WL 22283508 at ¶ 41, quoting *Perkins v. Quaker City* (1956), 165 Ohio St. 120, 125, 59 O.O. 151, 133 N.E.2d 595. Whether it will be granted depends on the character of the case, the peculiar facts involved, and other factors, among which are those relating to public policy and convenience. Id. Injunctive relief may be refused if granting it would be inequitable or unjust. Id.

{¶ 15} "Equity does not create rights; it merely provides remedies for the protection and vindication of recognized rights that otherwise exist." Id. at ¶ 42, citing *Bldg. Serv. & Maintenance Union v. St. Luke's Hosp.* (C.P.1967), 11 Ohio Misc. 218, 40 O.O.2d 500, 227 N.E.2d 265. It applies in those instances when the law has failed to make provision for some right about to be violated. Id., citing *Ricard Boiler & Engine Co. v. Benner* (1904), 14 Ohio Dec. 357, 1904 WL 729. It is, therefore, a preventative remedy, which guards against future injury rather than affording redress for past wrongs. Id., citing *Fischer v. Damm* (1930), 36 Ohio App. 515, 173 N.E. 449. The purpose of a preliminary injunction is to preserve the status quo pending the outcome of the case on the merits. *Union Twp. v. Union Twp. Professional Firefighters' Local 3412* (Feb. 14, 2000), Clermont App. No. CA99–08–082, 2000 WL 189959 at *2.

{¶ 16} A person seeking an injunction must make a case of a right at law, as well as one in equity that commends itself to the conscience of the court. *Hritz* at ¶ 43, citing *Kellogg v. Ely* (1864), 15 Ohio St. 64. "Therefore, to authorize interference by injunction the injury must be real, certain, substantial, serious, and direct." Id., quoting 56 Ohio Jurisprudence 3d (2003) 115, Injunctions, Section 18. Regard must be had for the rights of the complainant as well as for the injuries that may result to others as a result of the granting of the injunction. Id., citing *Richmond Hts. v. Bd. of Cty. Commrs.* (1960), 112 Ohio App. 272, 11 O.O.2d 475, 166 N.E.2d 143.

{¶ 17} The power of a court to issue an injunction should not be impaired by too free an exercise thereof. The injunctive power should be exercised cautiously and sparingly. Id. at ¶ 44, citing *Goodall v. Crofton* (1877), 33 Ohio St. 271. "Courts will not exercise the authority when the right is doubtful or the facts are not clearly ascertained." Id., citing *Spangler v. Cleveland* (1885), 43 Ohio St. 526, 3 N.E. 365.

50

{¶ 18} The court must consider the following when ruling on a motion for a preliminary injunction: "whether (1) the movant has shown a strong or substantial likelihood or probability of success on the merits, (2) the movant has shown irreparable injury, (3) the preliminary injunction could harm third parties, and (4) the public interest would be served by issuing the preliminary injunction." *Union Twp. v. Union Twp. Professional Firefighters' Local 3412*, Clermont App. No. CA99–08–082, 2000 WL 189959, quoting *Johnson v. Morris* (1995), 108 Ohio App.3d 343, 352, 670 N.E.2d 1023. See also *Back v. Faith Properties, L.L.C.*, Butler App. No. CA2001–12–285, 2002-Ohio-6107, 2002 WL 31502077, at ¶ 26; *Planck v. Cinergy Power Generation Servs.*, Clermont App. No. CA2002–12–104, 2003-Ohio-6785, 2003 WL 22947249, at ¶ 17. "Each element must be proven by the movant by clear and convincing evidence." *Union Twp.* at *2, citing *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.* (1996), 109 Ohio App.3d 786, 790, 673 N.E.2d 182. "Clear and convincing evidence is that degree of proof which produces in the mind of the trier of fact 'a firm belief or conviction as to the allegations sought to be established.'" Id., quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. When determining whether the movant has demonstrated a likelihood of success on the merits by clear and convincing evidence, "the movant must support its claim through the strength of its own case, not by any weakness in the nonmoving party's case." *Union Twp.* at *3, citing *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv. Admin.* (1997), 121 Ohio App.3d 372, 383, 700 N.E.2d 54. Further, "issuance of a preliminary injunction is appropriate 'where the [movant] fails to show a strong or substantial probability of ultimate success on the merits of [its] claim, but where [the movant] at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the [nonmoving party] if an injunction is issued.'" Id., quoting *In re DeLorean Motor Co.* (C.A.6, 1985), 755 F.2d 1223, 1229.

{¶ 19} The court notes that the *Union Twp.* court referred to the four-part standard for the issuance of a preliminary injunction as being composed of elements; however, the *Back v. Faith Properties, L.L.C.*, court refers to that same standard as being composed of factors. *Back* at ¶ 25. For purposes of this preliminary injunction, the court finds that the standard for the issuance of a preliminary injunction is composed of four established factors, not elements.

## LEGAL ANALYSIS

### Likelihood of Success on the Merits

#### *Misappropriation of Trade Secrets*

{¶ 20} The plaintiff argues that by "possessing, disclosing and/or making use of Plaintiff's confidential information, Defendants Overbeck, Callihan, Bishop, Elite

Fire Services, and other Elite Fire Services employees misappropriated Plaintiff's trade secrets." The confidential information to which the plaintiff is referring is "Plaintiff's route lists, cards and other memoranda of customers' names and addresses, prices, costs of doing business and other financial information." Further, the plaintiff alleges that the defendants had access to the plaintiff's "confidential customer list which contains each customer's name and address, telephone contact person, number of fire extinguishers, and dates of last inspection." Finally, the plaintiff alleges that the defendants had access to training materials that were developed and implemented by Silco at Silco's expense. These were not available to the public.

{¶ 21} Before the court can find that the defendants misappropriated trade secrets, the court must first determine whether the information to which the defendants had access was a trade secret. A trade secret is "information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." R.C. 1333.61(D).

{¶ 22} The following factors should be considered in analyzing a trade secret claim: (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *State ex rel. Plain Dealer v. Ohio Dept. of Ins.* (1997), 80 Ohio St.3d 513, 524–525, 687 N.E.2d 661, citing *Pyromatics, Inc. v. Petruziello* (1983), 7 Ohio App.3d 131, 134–135, 7 OBR 165, 454 N.E.2d 588.

{¶ 23} A business or possessor of a potential trade secret must take active steps to maintain its secrecy in order to enjoy presumptive trade status. Id. at 525, 687 N.E.2d 661, citing *Water Mgt., Inc. v. Stayanchi* (1984), 15 Ohio St.3d 83, 85–86, 15 OBR 186, 472 N.E.2d 715. "A customer list is an intangible asset that is presumptively a trade secret when the owner of the list takes measures to prevent its disclosure in the ordinary course of business to persons other than those selected by the owner." *State ex rel. Lucas Cty. Bd. of*

*Commrs. v. Ohio Environmental Protection Agency* (2000), 88 Ohio St.3d 166, 173, 724 N.E.2d 411, citing *Vanguard Trans. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.* (1996), 109 Ohio App.3d 786, 791, 673 N.E.2d 182.

{¶ 24} The plaintiff in this case maintains that the defendants took with them Silco customer lists, price lists, financial documents, and training. The defendants were in managerial positions while they were at Silco, and each of them had access to this information. Defendant Overbeck was also in possession of Silco financial statements that he received and retained in connection with his compensation. Further, it is not disputed that all of the defendants received training while at Silco and Silco paid for the licenses obtained by the defendants. The defendants have also admitted that they submitted bids at three schools (Worthington, Hilliard, and Ohio State), all of which they knew were Silco customers. These schools represented three of Silco's larger accounts. The defendants also contacted Smurfit–Stone, another Silco customer, on behalf of Elite and used the same contact person that they used while at Silco.

{¶ 25} However, the testimony indicates that the defendants could have obtained the service dates for the schools and other customers by means other than through Silco files. First, Callihan testified that he knew the Ohio State contact personally because the two were in a band together and spoke approximately twice per week. They were at band practice one evening when Callihan was asked to give a quote for the work Ohio State needed. He further testified that the Worthington School contact was a personal friend of his and that they knew one another because their children played baseball together. Callihan was told that Worthington was informed by Silco that Callihan was no longer with Silco. Callihan indicated to the Worthington contact, his friend, that he was interested in submitting a quote. Callihan was advised to submit a quote. Callihan has not heard back from Worthington. Bishop testified that Hilliard was a customer of Callihan's when Callihan was employed by Hood Fellows, which is now owned by Elite. This was prior to his employment with Silco, and Bishop further testified that Hilliard followed Callihan when he went to work for Silco.

{¶ 26} There was also testimony that such information was not confidential. Photographs of inspection tags are part of the record, and from those tags one could determine who tested the product last, when the test was performed, what test was performed, when the product is up for retest, and when the product is up for bid. The current tags, as well as the tags from past servicing dates, hang on the equipment and are visible for anyone to see. For example, the defendant Bishop was able to look at the inspection tags in this courthouse and determine all of the above information, including the fact that Silco services this court's fire-

protection equipment. There is no evidence to indicate that Bishop had prior knowledge of this information.

{¶ 27} The testimony also indicates that this is a door-to-door business, meaning that employees simply go from door-to-door and solicit business or go through a phone book. The defendants could have communicated with these companies and talked with the same contact people had they never worked for Silco. These customer names are available to Silco employees, as well as other businesses outside of Silco. Further, Silco did not have an exclusive contract with any of its customers. While Silco tried to preserve its relationships with its customers, its customers were free to change fire-protection companies.

{¶ 28} As for financial statements, Callihan testified that certain financial information was sent to him by Silco to supplement his compensation paperwork. His commission and salary were based upon these documents. Callihan testified that neither Bishop nor Overbeck has seen this particular binder. He further testified that the same information was posted on the company walls for all employees to see. While the information was not available outside of the company, it was widely available within the company. Silco did not take great precautions in guarding and protecting this information. Also, the fact that Callihan kept it with his compensation records does not necessarily mean that he is presently using it on behalf of Elite. Further, James Fraser, Silco's president, testified that these financial records from years past could not help Callihan determine the financial status of Silco today.

{¶ 29} There was also testimony that these individuals had access to Silco price sheets. While it may be true that these employees did see Silco price sheets at some point, there is no evidence that they took any price sheets with them or committed the price sheets to memory. Evidence indicates that Silco had eight price sheets in Portables alone, with about 40 prices per sheet. It would be nearly impossible for one person to memorize all of these prices. There was also testimony that prices on the sheets were updated every few years; therefore, the prices that the defendants were aware of several years ago are not the same as the prices today.

{¶ 30} Silco also did not take great strides to keep this information within the company. Testimony indicates that customers were allowed to keep the pricing list that was given to them by Silco. While it may be true that no evidence was presented to indicate that any Silco customer shared that list with a competitor, it is a very real possibility. A customer could easily show their price sheet to a competitor in hopes of receiving a better price. Further, everyone in the company had access to Silco price sheets. The sheets were kept in bins to which all employees had access. Silco did not take significant measures to protect this information.

{¶ 31} Further testimony indicated that there is no real formula for pricing, that three people from the same company could attempt to make a bid and all three would come up with a different price. Fraser testified that it is possible to have a ballpark estimate of what other companies would bid without ever having worked for them. This indicates to the court that the defendants could have placed bids that were close to Silco's even if they had never worked for Silco. Testimony also indicates that Elite uses only one price sheet for portables, whereas Silco had eight, which suggests that Elite is not using Silco price lists, but instead created its own. Further, there is no evidence that any of the three former Silco employees took with them or committed to memory Silco customer lists, master lists, route lists, or systems lists.

{¶ 32} Finally, as for the training, Silco did provide a significant amount of training to these employees. However, at least for the factory training, Silco was not the only company participating. The testimony suggests that Silco and its competitors would send their employees to factory training sessions where they would receive training as a group and not individually. The sessions were attended by employees from many different competitors, and all the attendees received the same training. The testimony indicates that the defendants in this case could have received the same training had they worked for another company, so long as that company was an authorized distributor. Therefore, the court finds that these factory-training sessions were not unique to Silco and any training received could not be considered confidential. As for the training manual, there was evidence that it was written by Bishop and Overbeck. They wrote the manual; therefore, there was not anything in it to which Bishop and Callihan were not already privy.

{¶ 33} The court holds that because all the information the defendants allegedly have was made available throughout the company, was available to others outside of Silco, was not adequately protected by Silco, and was so widely available that it could be acquired through minimal efforts, the information does not constitute a trade secret pursuant to the definition in R.C. 1333.61(D). It may take some effort to acquire the information, but this alone does not make the information a trade secret. Because the information does not constitute a trade secret, the defendants could not misappropriate it. Therefore, the court holds that the plaintiff failed to establish by clear and convincing evidence that the defendants misappropriated trade secrets.

### Breach of Contract

{¶ 34} The plaintiff also argues that the defendants breached their employment contract, specifically the covenants not to compete and the covenants not to disclose confidential information. A contract is defined as "as promise, or

set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. The essential elements of a contract are (1) offer, (2) acceptance, (3) contractual capacity, (4) consideration, (5) a manifestation of mutual assent, and (6) legality of object and of consideration. Id. "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." Id., citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 575 N.E.2d 134. The parties do not dispute for the purposes of this preliminary injunction that a valid and binding employment contract was entered into between the plaintiff, Silco, and the defendants, Overbeck, Callihan, and Bishop. Further, the parties do not dispute that the contract contained a covenant not to compete and a covenant not to disclose confidential information. However, the parties disagree as to the meaning and effect of the compensation provision of the employment contract.

 {¶ 35} The purpose of contract construction is to " 'ascertain and give effect to the intent of the parties.' " *Mansfield Plumbing Prods., L.L.C. v. Mariner Partners, Inc.* (N.D.Ohio 2004), 300 F.Supp.2d 540, 545, quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519. Generally a court will presume that the intent of the parties resides in the language they employ in the agreement. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949; *Middletown v. Internatl. Assn. of Firefighters, Local 336* (June 30, 1997), Butler App. No. CA96–12–0259, 1997 WL 366839, citing *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499. See also *FPC Fin. v. Wood,* Madison App. No. 2006–02–005, 2007-Ohio-1098, 2007 WL 731428, at ¶ 10, citing *Graham.* The instrument itself should be read as a whole when determining the intent of the parties. *Mansfield* at 545, citing *Foster Wheeler.* When reading the contract, "common words * * * will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *FPC Fin.* at ¶ 10, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus. The court should not interpret the words beyond their plain meaning or rewrite the contract if there is no ambiguity in the language of the contract itself. *Mansfield* at 545, citing *Werner v. Cincinnati Ins. Co.* (1991), 77 Ohio App.3d 232, 235, 601 N.E.2d 573. If no ambiguity appears on the face of the contract, parol evidence will not be considered in an effort to demonstrate an ambiguity. *Middletown* at *5 and *Mansfield* at 545.

 {¶ 36} However, if a term cannot be determined from the language employed, factual determination of intent may be necessary. *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Peterson Constr. Co.* (1998), 129 Ohio

App.3d 58, 63, 716 N.E.2d 1210, quoting *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271. When there are plausible conflicting interpretations of the words employed in a contract, the agreement becomes ambiguous. *Middletown* at *5. Courts may consider extrinsic evidence to "ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham* at 313–314, 667 N.E.2d 949. Further, when the parties have participated in acts and conduct in performance of the contract over a reasonable period of time leading to mutual adoption of one of the interpretations, that interpretation will be given to the ambiguous words of the contract. *State ex rel. Burgess & Niple v. Linzell* (1950), 153 Ohio St. 545, 42 O.O. 27, 93 N.E.2d 9, at syllabus.

{¶ 37} It is blackletter law in Ohio that if there is doubt or ambiguity in the language of the contract, it will be construed against the drafter. *Graham* at 314, 667 N.E.2d 949 and *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 80, 40 O.O.2d 87, 228 N.E.2d 304. "He who speaks must speak plainly or the other party may explain to his own advantage." *McKay*, 11 Ohio St.2d at 80, 40 O.O.2d 87, 228 N.E.2d 304.

{¶ 38} The compensation provision of the employment contract between Silco and Overbeck provides: "Employer and Employee hereby agree that Employee *shall* be employed in such capacity and at such salary and other compensation *may* be from time *mutually agreed upon between them,* all of which shall be confirmed by letter from Employer upon written request of Employee." (Emphasis added.) The court first notes that the drafter of the employment agreement failed to include the word "as" following "compensation" and preceding "may." This is different from Callihan's and Bishop's contracts. The court also notes that this particular provision reads "may be from time mutually agreed upon." The court believes that the drafter intended to use the phrase "from time to time," but those words do not appear on the face of any of the three contracts.

{¶ 39} With that being said, the court must analyze the contract as a whole to determine the intent of the parties. Two terms in the contract stand out to the court as being ambiguous. The court notes that the terms "shall" and "may" are in conflict in that the former is mandatory whereas the latter is permissive. The court is unable to determine from the language of the contract whether the term "shall" is controlling or whether the term "may" is controlling. Therefore, the court must use parol evidence to determine the intent of the parties.

{¶ 40} The plaintiff's interpretation of this provision is such that the plaintiff retains the right to unilaterally change the employee's compensation, with or

without the employee's consent. The defendants, however, interpret this provision to mean that they will be employed at a compensation that they mutually agree upon. The court finds that both interpretations are reasonable; therefore, the court must look to the surrounding facts and circumstances to determine the parties' intent.

{¶ 41} The president of Silco testified, as did the defendants, that the defendants' compensation was changed at least twice in the past, once in 2000 or 2001 and once in 2005. The employees disagreed with the change in 2000 or 2001, and they expressed their displeasure. However, they acquiesced to the changes when they continued to work for Silco, thereby agreeing to this change. They also disagreed with the compensation change made in 2005. Bishop testified that he spoke with Fraser regarding this change, and they came to a joint resolution as to Bishop's compensation. According to Bishop's testimony, the change in commission would take place, but not until Period 12. This is important because historically the biggest sales period for Silco was in Periods 9, 10, and 11, and he would get the same compensation from those sales as in the past. Bishop would also be eligible for a review and a raise in 2006. Even had they not come to this resolution, the employees mutually agreed to the compensation change when the three of them continued to work for Silco even after this change in compensation took effect.

{¶ 42} Overbeck testified that when changes were made in the past, the company would explain to the employees the reason for the changes and the effect. However, all defendants agree that the change in 2007 was different. There was not a satisfactory explanation given to the employees, and the reasons given were inconsistent. Fraser testified that the defendants objected to the change, but the change was implemented despite their protests. Fraser testified that the defendants did not resign until the change was implemented and that the change was made prior to their initial meeting at the Red Robin restaurant regarding the possibility of forming Elite. It may be argued that the employees acquiesced to the change by remaining with the company after the change was implemented; however, the defendants remained at Silco for only a few months after the change, and all defendants expressed displeasure over the 2007 change during that time in hopes that they could come to a joint resolution.

{¶ 43} Because ambiguous contracts are to be strictly construed against the drafter of the contract, the court finds that after reviewing the language of the contract itself and the conduct of the parties, the parties intended that any changes to employee compensation be implemented only if those changes were mutually agreed upon. First, the court would have to change the wording of the contract in order to get to Silco's interpretation. Silco used the term "mutually" not "unilaterally." Silco also used the term "shall" in the contract, which

58

indicates that the parties intended that changes in compensation were to be made only upon mutual consent of the parties. The fact that the term "may" appears in the compensation provision of the employment contract is of no legal significance because the parties acted as if they believed the changes were to be mutually agreed upon. For these reasons, the court finds that changes to employee compensation could be made only if those changes were mutually agreed upon. The defendants cannot be punished for Silco's vague contract language. "He who speaks must speak plainly or the other party may explain to his own advantage." *McKay*, 11 Ohio St.2d at 80, 40 O.O.2d 87, 228 N.E.2d 304.

{¶ 44} Because the compensation provision requires that the parties mutually agree upon changes in compensation, the court must now determine whether the plaintiff was in material breach when it unilaterally changed the defendants' compensation. "Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract." *Waste Mgt., Inc. v. Rice Danis Indus. Corp.* (S.D.Ohio, 2003), 257 F.Supp.2d 1076, 1084. A breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement. *Kersh v. Montgomery Dev. Ctr.* (1987), 35 Ohio App.3d 61, 62, 519 N.E.2d 665. To determine whether a breach is material, the following factors will be considered: (1) the extent to which the injured party will be deprived of the benefit that he reasonably expected, (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture, (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances, and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Waste Mgt., Inc.*, 257 F.Supp.2d at 1085, citing Restatement of the Law 2d, Contracts (1981), Section 241. See also *Kersh v. Montgomery Dev. Ctr., Ohio Dept. of Mental Retardation & Dev. Disabilities* (1987), 35 Ohio App.3d 61, 62–63, 519 N.E.2d 665, and *Russell v. Ohio Outdoor Advertising Corp.* (1997), 122 Ohio App.3d 154, 157, 701 N.E.2d 417.

{¶ 45} This compensation provision is obviously essential to the purpose of the contract. The defendants agreed to work for the plaintiff so long as the defendants were paid compensation that was mutually agreed upon. As already stated when the court discussed the interpretation of the contract, it is clear that the defendants reasonably expected to get paid in accordance with their employment contract. They had reason to believe that their compensation would not be

changed without their consent. Silco admittedly changed their compensation in January 2007 without their consent. Further, it is not likely that the defendants will be compensated for this deprivation, because they have already left the company. They attempted to negotiate with Silco prior to leaving the company, but Silco was not responsive. It is also not likely that Silco will cure its failure to obtain mutual consent to this change in compensation, because Silco does not feel that mutual consent is required and because the defendants are no longer Silco employees. All of the evidence indicates that the plaintiff is not willing to negotiate with the defendants.

{¶ 46} The court does not feel that the third factor is relevant to the facts of this case. As for the fifth factor, the court is not willing to find that the plaintiff acted in bad faith when it unilaterally changed the defendants' compensations, as this was a business decision and it is not the court's place to determine what is in the best interest of the business. However, the court finds that the first, second, and fourth factors weigh heavily in favor of the defendants. The plaintiff admittedly changed defendants' compensation without their consent and refused to negotiate with them. It is unlikely at this point that this failure could be cured, even if the plaintiff was willing. Therefore, the court finds that the plaintiff was in material breach of the employment contract when it unilaterally changed the defendants' compensations.

{¶ 47} The Covenants Not to Compete: Generally, courts have looked upon covenants not to compete with skepticism and have cautiously considered and scrutinized them. *Lake Land Emp. Group of Akron, L.L.C. v. Columber,* 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27. However, the validity of those agreements that contain reasonable geographical and temporal restriction has been recognized. Id. "A covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect an employer's legitimate interest." *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, paragraph one of the syllabus, and *Lake Land Emp. Group of Akron.* The covenant is reasonable if the restraint is "no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." Id. at paragraph two of the syllabus, and *Lake Land Emp. Group of Akron.* Among the factors to be considered are (1) the absence or presence of limitations as to time and space, (2) whether the employee represents the sole contact with the customer, (3) whether the employee is possessed of confidential information or trade secrets, (4) whether the covenant seeks to eliminate unfair competition or merely seeks to eliminate ordinary competition, (5) whether the covenant seeks to stifle the inherent skill and experience of the employee, (6) whether the benefit to the employer is disproportional to the detriment of the employee, (7) whether the

60

covenant operates as a bar to the employee's sole means of support, (8) whether the employee's talent that the employer seeks to suppress was developed during the period of employment, and (9) whether the forbidden employment is merely incidental to the main employment. *Raimonde*, 42 Ohio St.2d at 25, 71 O.O.2d 12, 325 N.E.2d 544, citing *Extine v. Williamson Midwest* (1964), 176 Ohio St. 403, 27 O.O.2d 375, 200 N.E.2d 297. See also *Am. Bldg. Servs., Inc. v. Cohen* (1992), 78 Ohio App.3d 29, 34, 603 N.E.2d 432. In noncompetition cases, the future effects of the covenant not to compete must be considered. *Globe Servs., Inc. v. Palmer* (Aug. 18, 1986), Butler App. No. CA 86–02–028, 1986 WL 8909, at *2. The court must consider whether real or long-term damage will result to the employer's goodwill or to the employer's future income because of the operation of the competing business. Id. If the court finds that the covenant is an unreasonable restriction upon the employee, the court may modify the restriction to make it reasonable. *Middletown Janitor Supply Co. v. R. David Hayes* (May 20, 1985), Butler App. No. CA84–03–040, 1985 WL 8673, *2.

{¶ 48} Because the court has already determined that the plaintiff was in material breach of the employment contract, the defendants' obligations under the covenant not to compete were fully discharged. For this reason, the court will not reach the issue of the reasonableness of the covenants not to compete. Therefore, the court finds that the plaintiff has failed to show by clear and convincing evidence a likelihood of success on its claim for breach of the covenant not to compete.

{¶ 49} The Covenants Not to Disclose Confidential Information: Further, the court finds that the defendants' obligations under the covenant not to disclose confidential information were fully discharged as a result of the plaintiff's material breach. The court notes that even if the plaintiff was not in material breach, the defendants have not breached this portion of the agreement. For the same reasons that the "confidential" information did not amount to trade secrets, the court further finds that the plaintiff failed to protect its information in such a way as to retain its confidentiality. Further, even if the information did amount to "confidential information," there is no evidence that the defendants took this information with them or that they disclosed the information to Silco's competitors, including Elite. For these reasons, the court finds that the plaintiff has failed to show by clear and convincing evidence a likelihood of success on its claim for breach of the covenant not to disclose confidential information.

*Intentional Interference with Business Relationships*
*and/or Contractual Relationships*

{¶ 50} The plaintiff also has a claim for intentional interference with a business relationship and/or intentional interference with a contractual relation-

ship. "The primary distinction between tortious interference with a contractual relationship and tortious interference with [a business relationship] is that interference with [a business relationship] applies to 'intentional interference with prospective contractual relations, not yet reduced to contract.'" *Reagan v. Ranger Transp., Inc.* (Dec. 4, 1998), Portage App. No. 97–P–0102, 1998 WL 964584, at *6, quoting 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B, Comment a. Tortious interference with a contractual relationship involves intentional interference with an existing contract.

{¶ 51} The following elements are necessary for recovery under a claim for tortious interference with a business relationship: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Wolf v. McCullough–Hyde Mem. Hosp., Inc.* (1990), 67 Ohio App.3d 349, 355, 586 N.E.2d 1204. The basic principle for an action based upon tortious interference is that "one, who is without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." Id. The following factors should be considered when determining whether a privilege exists: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." Id.

{¶ 52} In order to succeed on its claim for intentional interference with a business relationship, the plaintiff must first prove that a business relationship exists between the plaintiff and some third party. The court finds that the evidence clearly satisfies this requirement. The plaintiff argues and the defendants do not dispute that Ohio State University, Worthington Schools, Hilliard Schools, and Smurfit–Stone were all Silco customers. Likewise, the defendants do not dispute that they had knowledge that each of the above named companies was a Silco customer. Further, there is no dispute that the defendants attempted to interfere with Silco's relationship with these customers by submitting bids on behalf of Elite. The third element requires that the intentional interference actually causes a breach or termination of the relationship. The court finds that the interference did in fact cause a partial termination of the business relationship between Silco and Hilliard Schools. The defendant Callihan testified that Elite won the bid in part, but it lost extinguishers and backflow preventers to Silco. However, the court finds that even a partial termination of the business relationship is enough to satisfy the third element for intentional interference with a business relationship. There is no requirement that the business relationship be fully terminated. Finally, the court finds that Silco was damaged as a

result of this interference. Silco lost income on the services that the defendants provided to Hilliard; therefore, the plaintiff was damaged in that amount.

{¶ 53} However, not all intentional interferences are actionable. The court must find that a privilege existed before it can find that the defendants are liable for the interference. The court will apply the *Wolf v. McCullough–Hyde Mem. Hosp., Inc.*, factors in determining whether a privilege exists. The court finds that the defendants submitted bids to Silco's customers in hopes that they would leave Silco and come to Elite. The court also finds that the plaintiff had a reasonable expectation that its former employees would be loyal to their former employer and not attempt to take Silco's customers with them. The plaintiff had an expectation that its customers would remain with Silco even after the defendants left the company. The court further finds that the relationship between the parties was that of employer and employee. However, the defendants were not only employees of Silco, but were entrusted with managerial roles. The defendants then left Silco and began interfering with Silco's relationship with its customers in hopes of procuring those customers for Elite. The defendants sought to advance their new company at Silco's expense. Finally, society has a greater interest in protecting the expectancy of an employer that his managers will not leave his company and take his customers with them. Elite will not be hindered greatly if they were to be required to seek out their own customers rather than taking them from Silco.

{¶ 54} For the foregoing reasons, the court finds that the plaintiff has proved by clear and convincing evidence that it is likely to succeed on the merits of its claim for intentional interference with a business relationship. However, the same is not true for its claim for intentional interference with a contractual relationship.

{¶ 55} The following are the essential elements of a claim of intentional interference with a contract: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, at paragraph two of the syllabus. The plaintiff argues that each of the individual defendants had knowledge of each defendant's employment contract and intentionally caused them to breach the contract by leaving Silco and opening a competing company in violation of their employment agreement.

{¶ 56} The first requirement for the tort of tortious interference with a contract is that a contract exists. The court finds that no contract was in existence at the time the defendants left Silco's employ and opened Elite. The plaintiff materially breached the employment agreement in January 2007, thus

relieving the defendants of their obligations under the contract. Even if the court had not made this finding, the plaintiff could not satisfy its burden on this issue.

{¶ 57} The court finds that the second element is met in that all defendants knew that other Silco employees had the same or similar employment agreements as those that the defendants signed. However, pursuant to the third and fourth elements of the tort, the plaintiff must prove that each defendant intentionally procured the contract's breach and there was a lack of justification for this procurement. The court finds that the plaintiff has failed to satisfy this burden. There has been no evidence presented to this court to indicate that any of the defendants procured the other defendants' breaches by collaborating to form a competing company prior to the compensation change in January 2007. Instead, the evidence indicates that all of the defendants left Silco's employ only after Silco unilaterally changed their compensation and materially breached the employment agreement. For this reason, the court finds that it was Silco, and not each defendant, that actually caused the employees to leave Silco and open a competing company. The court further finds that the unilateral change in the employees' compensations was the justification for the employees' actions. For these reasons, the court finds that the plaintiff has failed to show by clear and convincing evidence the likelihood of success on the merits as to its claim for intentional interference with a contractual relationship.

### Irreparable Harm

{¶ 58} "Irreparable harm exists where there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, Fayette App. Nos. CA2005–03–009, and CA2005–03–011, 2006-Ohio-1002, 2006 WL 522457, at ¶ 24, citing *Crestmont Cadillac Corp. v. Gen. Motors Corp.*, Cuyahoga App. No. 83000, 2004-Ohio-488, 2004 WL 229127, ¶ 36. It is an injury "for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete." *Union Twp.* at *3, quoting *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 12, 684 N.E.2d 343. "[A]dequate remedy of law 'means that the legal remedy must be as efficient as the indicated equitable remedy would be; that such legal remedy must be presently available in a single action; and that such remedy must be certain and complete.'" *Ohio Pyro* at ¶ 25, quoting *Mid–America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 380, 2002-Ohio-2427, 768 N.E.2d 619, ¶ 81. Actual harm is not required as "a threat of harm is a sufficient basis on which to grant injunctive relief." *Convergys Corp. v. Tackman* (2006), 169 Ohio App.3d 665, 666–667, 864 N.E.2d 145, citing *Procter & Gamble Co. v. Stoneham* (2000),

140 Ohio App.3d 260, 274, 747 N.E.2d 268. The loss of customer goodwill often amounts to irreparable harm because the damages are difficult to compute. *Basicomputer Corp. v. Scott* (C.A.6, 1992), 973 F.2d 507. The fact that plaintiff could use Elite's internal records to determine the exact monetary amount it would lose as a result of the defendants' actions does not necessarily mean that it would be made whole through an award in that amount. *Globe,* at *2. The court must consider whether "real or long term damage" would occur to the plaintiff's goodwill or future income. Id., citing *State ex rel. Great Lakes College, Inc. v. Med. Bd.* (1972), 29 Ohio St.2d 198, 58 O.O.2d 406, 280 N.E.2d 900.

**▇▇▇▇** {¶ 59} Fraser admitted in his deposition that he could quantify the amount of money the company would lose if Elite were to win the bids that it has already submitted. The testimony indicates that the defendants did not win the full Hilliard bid and have not received business from the other companies. While it is possible that they might eventually win these bids, Fraser testified that he could quantify the damages in Columbus to be approximately $269,000. However, this does not take into account increases and decreases in 2007. The court has considered allowing Elite to submit bids to Silco customers because Silco could quantify the approximate amount of harm it would suffer as a result. However, the court notes that Silco's figures would be only an approximation. In order for a legal remedy to be adequate, the legal remedy must be certain. *Ohio Pyro* at ¶ 25. Until Silco actually submits another bid, it does not know the amount that it would receive from these companies, because the cost of their services may change. Therefore, the quantification is merely speculative and cannot be made certain. Because the monetary figure is speculative, the court finds that it is difficult to compute and possibly incomplete. However, the court cannot find that such a calculation would be impossible.

{¶ 60} There is also evidence before the court that there are at least three former Silco general managers who worked for competitors of Silco after their termination from Silco. According to Bishop, he has personal knowledge that one former employee went to work for Zig–Zigler, a motivational speaker, immediately upon leaving Silco, but opened his own fire-protection company four months before his noncompete clause expired. The second opened his own company, but Bishop was not aware whether it was within the time limitations of his noncompete clause. Finally, the third employee left Silco and began working at Siemens. There is no evidence in the record that Silco obtained a TRO or injunction against those individuals or that they took legal action of any kind against them. This suggests to the court that Silco either did not suffer actual harm as a result of those individuals competing with Silco or that Silco felt the degree of actual harm to be slight. Further, this evidence indicates that Silco felt little or no threat of harm even though those individuals were in managerial roles, much like the

defendants in this action. The testimony indicates that the defendants in this action played different roles at Silco even though they were in the same or similar positions as those general managers in the past. For these reasons, the court finds that the plaintiff has shown that the degree of irreparable harm is greater in this case than in the past cases.

{¶ 61} The court finds that the plaintiff has shown by clear and convincing evidence that the plaintiff will suffer at least some irreparable harm if this preliminary injunction is not granted. However, the court finds the degree of irreparable harm difficult to determine. The court cannot find that the plaintiff will suffer a great degree of harm since the court believes that it is possible, albeit difficult, for the plaintiff to calculate its damages resulting from the loss of its customers. Thus, for these reasons, the court finds that the plaintiff has proven by clear and convincing evidence a low degree of irreparable harm in this case.

### Harm to Third Parties

{¶ 62} The plaintiff, as the moving party, had the burden to show by clear and convincing evidence that third parties would not be harmed by the issuance of this injunction. *Union Twp. v. Union Twp. Professional Firefighters' Local 3412* (Feb. 14, 2000), Clermont App. No. CA99–08–082, 2000 WL 189959, quoting *Johnson v. Morris* (1995), 108 Ohio App.3d 343, 352, 670 N.E.2d 1023. See also *Back v. Faith Properties, L.L.C.*, Butler App. No. CA2001–12–285, 2002-Ohio-6107, 2002 WL 31502077, at ¶ 26; *Planck v. Cinergy Power Generation Servs.*, Clermont App. No. CA2002–12–104, 2003-Ohio-6785, 2003 WL 22947249 at ¶ 17. The court finds that this is the standard adopted by the Court of Appeals for the Twelfth District. There is no requirement that the court weigh the potential injury to the defendant if the injunction is granted against the potential injury to the plaintiff if the injunction is denied. The court, therefore, must only determine whether the plaintiff has shown by clear and convincing evidence that no third parties will be harmed by the granting of an injunction. Further, a determination on this factor is not essential to the issuance of a preliminary injunction. *Back* at ¶ 34. The court could find that the factor does not weigh in favor of either party and still grant the injunction in this case. Id. The court notes that neither the plaintiff nor defendants made mention of this factor or of any harm that may or may not be suffered by third parties. Therefore, the court finds that this factor does not weigh in favor of granting the injunction or in denying the injunction.

{¶ 63} The court notes that the plaintiff relies on a case from the Eighth District, which requires that the potential injury that may be suffered by the defendant will not outweigh the potential injury suffered by the plaintiff if the

injunction is not granted, i.e., that the defendants will not be unduly harmed by the granting of the preliminary injunction. *Cleveland v Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 684 N.E.2d 343, 350. The court finds that this is not the standard adopted by the Twelfth District and, therefore, the court will not consider it in determining whether to issue a preliminary injunction in this case.

{¶ 64} With that being said, the defendants would suffer little harm if the court enjoined them from submitting quotes to current Silco customers because, as the defendants have testified, fire protection is a door-to-door business. It is possible for them to build their business by going door-to-door and looking through the phonebook, just as Rod Bishop did when he grew Silco's Columbus office. By allowing them to submit bids to Silco's customers, the court would give them an unnecessary and unfair advantage.

### Public Interest

{¶ 65} With regard to the fourth factor, the public interest would be served by the granting of the injunction. The public has an interest in fair competition in the workplace. While it may be true that the public has an interest in fire protection in general, this interest may still be satisfied if the court were to grant an injunction. Fire protection is such a competitive business that the public would not be deprived of choices for fire services, timely service, and competitive pricing. The court finds that the plaintiff has established by clear and convincing evidence that the public interest would be served by the granting of this preliminary injunction.

### CONCLUSION

{¶ 66} The court hereby finds that the plaintiff has failed to prove by clear and convincing evidence that the plaintiff is likely to succeed on the merits of its claims for breach of contract, misappropriation of trade secrets, and intentional interference with contractual relationship. The court further finds that the plaintiff has shown by clear and convincing evidence that the plaintiff will suffer a low degree of irreparable harm between now and trial if this injunction is denied. The court does not believe, however, that the degree of irreparable harm outweighs the plaintiff's failure to show even serious questions going to the likelihood of success on the merits for its claims of breach of contract, misappropriation of trade secrets, and intentional interference with contractual relationships. The court finds that the third factor, which requires that third parties are not harmed by the granting of the injunction, does not weigh in favor of either granting or denying the preliminary injunction. Finally, the plaintiff has shown that a preliminary injunction is in the public interest. However, the court does not give this factor as much weight as likelihood of success on the merits and

irreparable harm. For the aforementioned reasons, the court hereby denies the preliminary injunction on the issues of breach of contract, misappropriation of trade secrets, and intentional interference with contractual relationships.

{¶ 67} The court further finds that the plaintiff has proven by clear and convincing evidence a strong or substantial likelihood of success on the merits of its claim for intentional interference with a business relationship. The court further finds that the plaintiff has shown by clear and convincing evidence that the plaintiff will suffer a low degree of irreparable harm between now and trial if this injunction is denied. The court believes that the degree of irreparable harm is great enough to support granting an injunction, on the issue of intentional interference with a business relationship, since the court found a strong or substantial likelihood of success on the merits of this claim. Further, the court finds that the third factor, which requires that third parties are not harmed by the granting of the injunction, does not weigh in favor of either granting or denying the preliminary injunction. Finally, the plaintiff has shown that a preliminary injunction is in the public interest. For the aforementioned reasons, the court hereby grants the preliminary injunction on the issue of intentional interference with a business relationship.

{¶ 68} The defendants are hereby enjoined from soliciting and doing business with current Silco customers pending the outcome of this case. A current Silco customer for the purposes of this preliminary injunction is defined as a company, governmental entity, school, individual, or any entity that was a customer of Silco on the date that both the verified complaint was filed and the TRO was issued in this case, June 20, 2007.

{¶ 69} The court notes that Elite won a portion of its bid with Hilliard prior to the filing of the verified complaint and the issuance of the TRO on June 20, 2007. The court finds that since the purpose of a preliminary injunction is to maintain the status quo pending the outcome of a trial on the merits, Elite is not estopped from servicing Hilliard pursuant to their current agreement.

{¶ 70} The court hereby orders David Nenni or Michael Glassman, attorneys for the plaintiff, to submit an appropriate entry within 14 days of this decision.

So ordered.